

VIA FAX

1   SCOTT P. COOPER, SBN 96905
      scooper@proskauer.com
2   KEITH BUTLER, SBN 215670
      kbutler@proskauer.com
3   PROSKAUER ROSE LLP
  2049 Century Park East, 32nd Floor
4   Los Angeles, California 90067-3206
  Telephone: (310) 557-2900
5   Facsimile: (310) 557-2193



6   Attorneys for Defendant
  MBIA, INC.
7

8            UNITED STATES DISTRICT COURT

9           NORTHERN DISTRICT OF CALIFORNIA

10            SAN FRANCISCO DIVISION

11   CITY OF STOCKTON,           CV **08**   **4031**

12           Plaintiff,     Case

13          v.             **NOTICE OF REMOVAL OF
CIVIL ACTION FROM THE**

14                    **SUPERIOR COURT OF THE**

15   AMBAC FINANCIAL GROUP INC.;   **STATE OF CALIFORNIA FOR
MBIA, INC.; XL CAPITAL**        **THE COUNTY OF SAN**

16   ASSURANCE INC.; ACA FINANCIAL   **FRANCISCO; DECLARATION
GUARANTY CORP; FINANCIAL**     **OF SCOTT COOPER**

17   GUARANTY INSURANCE COMPANY;   **IN SUPPORT THEREOF
CIFG ASSURANCE NORTH AMERICA,**

18   INC.; JASON KISSANE; NEIL PACK;   (L.A. Superior Court,
and Does 1 – 50,              Case No. CGC-08-477848)

19          Defendants.       **[No Hearing Required]**

20

21

22

23

24

25

26

27

28

1  TO THE CLERK OF THE ABOVE-ENTITLED COURT:

2       PLEASE TAKE NOTICE that defendant MBIA, Inc. ("MBIA"), pursuant to

3  28 U.S.C. §§ 1332, 1441, and 1446,  gives notice that the above-captioned matter is

4  hereby removed to the United States District Court for the Northern District of

5  California from the Superior Court of California, County of San Francisco, where it

6  originally was filed as Case No. CGC-08-477848 on July 23, 2008.

7  **I.     THIS NOTICE OF REMOVAL IS TIMELY AND PROPERLY FILED**

8       1.     Plaintiff filed the complaint in this matter in the Superior Court of

9  California in and for the County of San Francisco on or about July 23, 2008.

10  (Declaration of Scott P. Cooper ("Cooper Decl.") at ¶ 2.)

11       2.     The first date upon which defendant MBIA was served with a copy of

12  the Summons and Complaint was August 15, 2008.  (Cooper Decl. at ¶ 2.)  A copy

13  of the Summons and Complaint is attached as Exhibit A to the accompanying

14  Cooper Declaration.

15       3.     Pursuant to 28 U.S.C. § 1446(a), Exhibit A constitutes the only process,

16  pleadings, and orders served upon MBIA in this case.

17       4.     Pursuant to 28 U.S.C. § 1446(b), MBIA is filing this Notice of

18  Removal within thirty (30) days of service on it of the Summons and Complaint.

19  Moreover, MBIA is filing this Notice of Removal within thirty days of service of

20  the Summons and Complaint on any other party in this action. *See Murphy Bros.,*

21  *Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354, 119 S. Ct. 1322, 1328, 143

22  L.Ed. 2d 448 (1999) (holding that time for removal does not begin to run prior to

23  service of process); *Luchetti v. Hershey Co.*, No. 08-1629, 2008 WL 2331965, at *3

24  (N.D. Cal. June 4, 2008) (finding formal service of process "a prerequisite for

25  triggering the 30-day removal period").

26       5.     Venue is proper under 28 U.S.C. § 1441(a), which provides for removal

27  to the district court of the United States for the district and division embracing the

28  place where the action is pending.

7583/53559-017
Current/1189655

6.    Notice of this removal is being given both to the adverse party and to the state court pursuant to 28 U.S.C. § 1446(d).  A true and correct copy of the Notice to Adverse Party is attached hereto as Exhibit B to the Cooper Declaration. A true and correct copy of the Notice to State Court is attached hereto as Exhibit C to the Cooper Declaration.

7.    Additionally, Plaintiff's counsel in this matter filed a nearly identical complaint on July 23, 2008 on behalf of the City of Los Angeles in the Superior Court of California in and for the County of Los Angeles, entitled City of Los Angeles v. Ambac Financial Group Inc. *et al.*, under Docket No. BC394943.   That action also is being removed concurrently to federal court.

## II.    INTRADISTRICT ASSIGNMENT

8.    Because Plaintiff alleges that any alleged wrongdoing centered in the city of San Francsico (Complaint at ¶¶ 45-49), and because Plaintiff initially commenced the Action in the Superior Court of the State of California for the County of San Francisco, pursuant to 28 U.S.C. § 84(a) and Civil Local Rule 3-5(b), the Action once removed is properly assigned to the San Francisco Division of the United States District Court for the Northern District of California.

## III.    BASIS OF REMOVAL

9.    The Court has original jurisdiction over this civil action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the properly-joined parties.

10.    Plaintiff City of Stockton ("Plaintiff") is a California public entity. (Complaint at ¶ 25)

11.    Defendant Ambac Financial Group Inc. is a Delaware corporation with its principal place of business in New York, New York.  (Complaint at ¶ 26)

12.    Defendant MBIA Inc. is a Connecticut corporation with its principal place of business in Armonk, New York.  (Complaint at ¶ 27)

3

7583/53559-017
Current/1189655

1      13.    Defendant XL Capital Assurance Inc. is a New York corporation with

2  its principal place of business in New York, New York. (Complaint at ¶ 28)

3      14.    Defendant ACA Financial Guaranty Corporation is a Maryland

4  corporation with its principal place of business in New York, New York.

5  (Complaint at ¶ 29)

6      15.    Defendant Financial Guaranty Insurance Company is a New York

7  corporation with its principal place of business in New York, New York.

8  (Complaint at ¶ 30)

9      16.    Defendant CIFG Assurance North America, Inc. is a New York stock

10  insurance company with its principal place of business in New York. (Complaint at

11  ¶ 31)

12      17.    Accordingly, none of these defendants (the "Bond Insurers") are

13  citizens or residents of California.

14      18.    Although the Complaint does not attempt to quantify the alleged

15  damages, it is clear from the Complaint that the amount in controversy easily

16  exceeds $75,000 as required by 28 U.S.C. § 1332(b). For example, the Complaint

17  states that California public entities paid "hundreds of millions of dollars" in

18  premiums for bond insurance that the Complaint alleges was "worthless."

19  (Complaint at ¶ 2) Plaintiff also seeks punitive and exemplary damages (Complaint

20  at ¶ E), which are included in the calculation of the amount in controversy. *See Bell*

21  *v. Preferred Life Assur. Soc.*, 320 U.S. 238, 240, 64 S. Ct. 5, 6, 88 L.Ed. 15 (1943).

22  **IV.   DEFENDANTS JASON KISSANE AND NEIL PACK HAVE BEEN**

23          **FRAUDULENTLY JOINED**

24      19.    In addition to the Bond Insurers, Plaintiff has named as defendants two

25  individuals, Jason Kissane and Neil Pack, who are alleged to be California citizens,

26  for the sole purpose of destroying complete diversity and preventing defendants

27  from removing this case to federal court.

28      20.    Aside from their statuses as current and/or former employees of certain

7583/53559-017
Current/1189655

1  of the defendants, Kissane and Pack have no connection to the alleged activities that

2  lie at the core of this case, and they are not the subject of any specific allegations of

3  conduct that would be sufficient to state a claim against either of them.  Given the

4  limited roles of these two individuals in the matters about which Plaintiff complains,

5  there is no possibility that Plaintiff can state a cause of action against either of them.

6      21.    Accordingly, Kissane and Pack were fraudulently joined and they

7  should be disregarded in determining the presence of diversity jurisdiction.  It is

8  well-established law that fraudulently joined resident defendants will not defeat a

9  defendant's right of removal on diversity grounds.  *Wilson v. Republic Iron & Steel*

10  *Co.*, 257 U.S. 92, 97, 42 S. Ct. 35, 37, 66 L.Ed. 144 (1921); *Ritchey v. Upjohn Drug*

11  *Co.*, 139 F.3d 1313, 1318 (9th Cir. 1998).  Joinder is fraudulent if "the plaintiff fails

12  to state a cause of action against a resident defendant, and the failure is obvious

13  according to the settled rules of the state."  *McCabe v. Gen. Foods Corp.*, 811 F.2d

14  1336, 1339 (9th Cir. 1987).

15      22.    Only the Fourth and Sixth causes of action – negligent

16  misrepresentation and violation of the Cartwright Act – are brought against Kissane

17  and Pack, and the Complaint, which mentions Pack and Kissane specifically in only

18  five paragraphs (Complaint at ¶¶ 24, 32, 33, 133, 134), falls far short of stating

19  those claims.

20      23.    With respect to the negligent misrepresentation claim, the essential

21  elements are: "(1) a false statement of a material fact that the defendant honestly

22  believes to be true, but made without reasonable grounds for such belief, (2) made

23  with the intent to induce reliance, (3) reasonable reliance on the statement, and (4)

24  damages."  *Century Sur. Co. v. Crosby Ins., Inc.*, 124 Cal. App. 4th 116, 129, 21 Cal.

25  Rptr. 3d 115, 125 (2004).  A claim of negligent misrepresentation under California

26  law "must be pleaded with particularity and by facts that show how, when, where, to

27  whom, and by what means the representations were tendered."  *Charnay v. Cobert*,

28  145 Cal. App. 4th 170, 185 n.14, 51 Cal. Rptr. 3d 471, 482 n.14 (2006) (internal

7583/53559-017
Current/1189655

1 quotations omitted); *see also Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513,

2 519, 23 Cal. Rptr. 3d 1, 5 (2004) ("The policy of liberal construction of pleadings is

3 not generally invoked to sustain a misrepresentation pleading defective in any

4 material respect."). The Complaint fails to allege a single statement made by

5 Kissane or Pack, to Plaintiff or anyone else, much less a false statement of a

6 material fact, honestly believed to be true, but made without reasonable grounds for

7 such belief and with the intent to induce reliance. Furthermore, to the extent that

8 Plaintiff bases its claim on alleged omissions in financial statements and other

9 public disclosures made by the Bond Insurers, Kissane and Pack played absolutely

10 no roles in making those statements and owed no independent duty to Plaintiff with

11 respect to those disclosures.

12     24.     The Complaint also plainly fails to state a claim for violation of the

13 Cartwright Act, Cal. Bus. & Prof. Code § 16720 *et seq*. against Pack and Kissane.

14 Settled California law requires that to state a claim for a conspiracy in restraint of

15 trade, a complaint must allege "(1) the formation and operation of the conspiracy,

16 (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from

17 such act or acts." *Chicago Title Ins. Co. v. Great W. Fin. Corp.*, 69 Cal.2d 305, 316,

18 70 Cal. Rptr. 849, 856 (1968). "California requires a 'high degree of particularity'

19 in the pleading of Cartwright Act violations, ... and therefore generalized

20 allegations of antitrust violations are usually insufficient." *Freeman v. San Diego*

21 *Ass'n of Realtors*, 77 Cal. App. 4th 171, 196, 91 Cal. Rptr. 2d 534, 553 (2000)

22 (*quoting Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 742, 162 Cal.

23 Rptr. 543, 547 (1980)). Moreover, under the pleading standard established in *Bell*

24 *Atl. Corp. v. Twombly*, ___U.S.___, 127 S.Ct. 1955,167 L.Ed.2d 929 (2007), the

25 "[f]actual allegations must be enough to raise a right to relief above the speculative

26 level." *Id.* at 1964-65. A complaint must allege "enough facts to state a claim to

27 relief that is plausible on its face." *Id.* at 1974. *See also In re Late Fee and Over-*

28 *Limit Fee Litigation*, 528 F. Supp. 2d 953, 965 (N.D. Cal. 2007) (applying

6

1 *Twombly*'s pleading standard in dismissing Cartwright Act claim on grounds that

2 "analysis under California's antitrust law mirrors the analysis under federal law");

3 *Korea Kumho Petrochemical v. Flexsys Am.*, No. C07-01057, 2008 WL 686834 at

4 *8 (N.D. Cal. Mar. 11, 2008) (same, stating that "California state courts follow

5 federal cases in deciding claims under the Cartwright Act").

6      25.     With respect to Kissane and Pack, the Complaint simply alleges, in

7 conclusory fashion, that they "knew and acted in concert with other Defendants to

8 maintain the dual rating system."   Such general allegations are not sufficient to state

9 a claim unless "the unlawful acts or civil wrongs are otherwise sufficiently alleged."

10 *Chicago Title Ins.*, 69 Cal.2d at 316, 70 Cal. Rptr. at 856.   The only act that the

11 Complaint alleges with respect to Kissane and Pack is their attendance of two

12 industry conferences, where it is alleged that the topics of "the municipal bond

13 insurance industry" and "how to maintain the bond insurance industry by

14 perpetuating the dual rating system" were discussed.   (Complaint at ¶ 133, 134)

15 This allegation clearly does not sufficiently allege any unlawful acts or civil wrongs.

16      26.     Moreover, Pack and Kissane are not individually liable for any alleged

17 wrongful acts of their employers because they themselves were not personally

18 involved in those acts.  See Cal. Civ. Code § 2343.  Although the doctrine of

19 *respondeat superior* may make a corporation liable for the acts of its employees, the

20 reverse does not hold true – an employee is not generally individually liable for the

21 wrongful acts of its employer corporation.

22      27.     For the reasons set forth above, there is no reasonable basis to argue

23 that California law could impose individual liability on Kissane or Pack for

24 negligent misrepresentation or violations of the Cartwright Act.  There are no facts

25 pled in the Complaint to support a claim that Kissane or Pack engaged in the alleged

26 unlawful activities, nor could such facts be pled in an amended complaint.  Both

27 Kissane and Pack worked in public finance departments.  They had little to no

28 interaction with their companies' structured finance departments, and they had no

7

7583/53559-017
Current/1189655

1   responsibility for or involvement in preparation of their companies' financial
2   statements or other public disclosures.  They also had little interaction with the
3   rating agencies, which consisted of occasional communications about analyses of
4   particular municipal bond issues, and they certainly never had any discussions about
5   the ratings agencies' bond rating standards or processes, much less the ability to
6   dictate to the ratings agencies any aspects of them.   Kissane's and Pack's
7   attendance at industry conferences, along with hundreds of individuals representing
8   issuers, insurers, investment bankers, and financial advisers, is not indicative of any
9   wrongdoing.  The fraudulent joinder of Kissane and Pack, who have "no real
10  connection with the controversy," cannot defeat the defendants' right of removal.
11  *Wilson*, 257 U.S. at 97, 42 S. Ct. at 37.

## V.    DOE DEFENDANTS DO NOT DEFEAT REMOVAL

13          28.    The Doe defendants should be disregarded in determining the presence
14  of diversity jurisdiction because the Complaint does not identify who they are,
15  where they live, or their relationship to this case.  *McCabe*, 811 F.2d at 1339.

## VI.   CONSENTS TO REMOVAL

17          29.    All defendants other than the improperly-joined Kissane and Pack have
18  joined in this Notice of Removal, as evidenced by the Consents to Removal attached
19  as Exhibit D to the Cooper Declaration.  *Emrich v. Touche Ross & Co.*, 846 F.2d
20  1190, 1193 n.1 (9th Cir. 1988) ("[U]nder 28 U.S.C. § 1446(a), all defendants in a
21  state action must join in the petition for removal, except for nominal, unknown or
22  fraudulently joined parties.")

23  ///
24  ///
25  ///
26  ///
27  ///
28

7583/53559-017
Current/1189655

1      30.    WHEREFORE, MBIA respectfully requests that the above-captioned

2  action be removed from the Superior Court of California for the County of San

3  Francisco to this Court.

4

5  DATED: August 22, 2008          SCOTT P. COOPER

6                           KEITH BUTLER
                                PROSKAUER ROSE LLP

7

8                           By: _____

9                               Scott P. Cooper
                           Attorneys for Defendants
                           MBIA, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF SCOTT P. COOPER

I, Scott P. Cooper, declare that the foregoing is true and correct to the best of my knowledge and belief :

1.    I am an attorney with the law firm of Proskauer Rose LLP, attorneys of record for MBIA, INC ("MBIA"). I am admitted to practice before this Court, and am one of the attorneys responsible for the defense in this case. Except as may be expressly noted below, I have personal knowledge of the facts set forth herein.

2.    I am informed and believe that the Complaint and Summons were filed in the San Francisco County Superior Court on July 23, 2008. I am informed and believe that on August 15, 2008, Plaintiff served the Complaint and Summons on MBIA. True and correct copies of the Complaint and Summons served on MBIA are attached hereto as Exhibit A.

3.    Attached hereto as Exhibit B is a true and correct copy of the Notice to State Court, which will be filed and served following the filing of this Notice of Removal.

4.    Attached hereto as Exhibit C is a true and correct copy of the Notice to Adverse Party, which will be filed and served following the filing of this Notice of Removal.

5.    Attached hereto as Exhibit D are true and correct copies of Consents to Removal from all defendants other than Mr. Pack and Mr. Kissane.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed this 22nd day of August, 2008, at Los Angeles, California.

_____
Scott P. Cooper

CITY OF STOCKTON v. AMBAC FINANCIAL GROUP INC., et al.


NOTICE OF REMOVAL OF CIVIL ACTION FROM THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA FOR THE COUNTY OF SAN FRANCISCO;
DECLARATION OF SCOTT COOPER IN SUPPORT THEREOF


# EXHIBIT A

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
AMBAC Financial Group Inc.; MBIA Inc.;XL Capital
Assurance Inc.;ACA Financial Guaranty Corp.;Financial
Guaranty Insurance Company;CIFG Assurance North
America, Inc.;Jason Kissane;Neil Pack;.and Does.1-50.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
City of Stockton

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California
400 McAllister Street

San Francisco 94102
Civic Center Courthouse

CASE NUMBER:
*(Número del Caso):* 08-477848

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Nanci E. Nishimura (152621)          (650) 697-0577
Cotchett, Pitre & McCarthy
840 Malcolm Road
Burlingame, CA 94010

Gordon Park-Li

DATE: July 23 2008
*(Fecha)*                    Clerk, by _____, Deputy
                             *(Secretario)*                          *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* MBIA, Inc.

   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

1 | Richard E. Nosky, Jr. (#130726)
   | ren.nosky@ci.stockton.ca.us
2 | **CITY ATTORNEY, CITY OF STOCKTON**
   | 425 North El Dorado Street
3 | Stockton, CA 95202-1950
   | Telephone: (209) 937-8000
4 | Facsimile: (209) 937-8898

*SAN ... Exempt from filing
and motion fees per
Gov't Code § 6103*

CASE MANAGEMENT CONFERENCE SET

DEC 2 6 2008 - 9:00 AM

DEPARTMENT 212

5 | Joseph W. Cotchett (#36324)
   | jcotchett@cpmlegal.com
6 | Nanci E. Nishimura (#152621)
   | nnishimura@cpmlegal.com
7 | Stuart G. Gross (#251019)
   | sgross@cpmlegal.com
8 | **COTCHETT, PITRE & McCARTHY**
   | San Francisco Airport Office Center
9 | 840 Malcolm Road, Suite 200
   | Burlingame, CA 94010
10 | Telephone: (650) 697-6000
    | Facsimile: (650) 697-05

William H. Parish (#95913)
whparish@parishsmall.com
**PARISH & SMALL**
1919 Grand Canal Blvd., Suite A-5
Stockton, CA 95207-8114
Telephone: (209) 952-1992
Facsimile: (209) 952-0250

11

12 | *Attorneys for Plaintiff City of Stockton*

13 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14 | **IN AND FOR THE COUNTY OF SAN FRANCISCO**

15 | CITY OF STOCKTON

16 |      Plaintiff,
    |      vs.

17 | AMBAC FINANCIAL GROUP, INC.;

18 |

19 | MBIA INC.;

20 | XL CAPITAL ASSURANCE INC.;

21 | ACA FINANCIAL GUARANTY CORP.;

22 | FINANCIAL GUARANTY INSURANCE
    | COMPANY;

23 | CIFG ASSURANCE NORTH AMERICA,
    | INC.;

24 | JASON KISSANE;

25 |

26 | NEIL PACK; and

27 | DOES 1 - 50.

28 |      Defendants.

Case No. CGC-08-477848

**COMPLAINT FOR:**

(1)   BREACH OF THE COVENANT
     OF GOOD FAITH AND FAIR
     DEALING;

(2)   FRAUD AND DECEIT;

(3)   BREACH OF CONTRACT

(4)   NEGLIGENT
     MISREPRESENTATION;

(5)   NEGLIGENCE; and

(6)   VIOLATIONS OF
     CARTWRIGHT ACT (CAL.
     BUS. & PROF. CODE §§ 16720
     *et. seq.*);

**JURY TRIAL DEMANDED**

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

COMPLAINT

# TABLE OF CONTENTS

Page(s)

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

III.  JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      A.    Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      C.    Doe Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      D.    Credit Rating Agencies . . . . . . . . . . . . . . . . . . . . . . . . . 11

      E.    Agents and Co-Conspirators . . . . . . . . . . . . . . . . . . . . . 12

V.    WRONGDOING CENTERED IN SAN FRANCISCO . . . . . . . . . . . . 13

VI.   OVERVIEW OF THE MUNICIPAL BOND MARKET . . . . . . . . . . 14

      A.    Municipal Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.    History of Bond Ratings . . . . . . . . . . . . . . . . . . . . . . . . 15

      C.    History of Municipal Bond Insurance . . . . . . . . . . . . . . . 16

VII.  THE DEFENDANTS HAVE ENGAGED IN UNLAWFUL
      CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      A.    Municipal Bonds are Rated by Credit Rating Agencies . . . . . . . . . 17

      B.    The Bond Insurance Companies Reap Illegal Profits . . . . . . . . . . . 19

      C.    Conspiracy in the Bond Insurance Industry . . . . . . . . . . . . . . . . . 20

      D.    The Defendants Failed to Disclose Their True Financial Condition
            and Risk Exposure to Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VIII. CREDIT RATING AGENCIES ADMIT THE FLAWED
      NATURE OF THE DUAL RATING SYSTEM . . . . . . . . . . . . . . . 29

IX.   INDUSTRY ASSOCIATIONS USED FOR CONSPIRACY . . . . . . . . 31

X.    CALIFORNIA PUBLIC ENTITIES SUCH AS STOCKTON
      SUFFERED INJURY THROUGH THE CONDUCT OF THE
      DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

XI.   GOVERNMENT INVESTIGATIONS INTO THE
      DUAL RATING SYSTEM IN THE BOND MARKET . . . . . . . . . . . 34

XII.   FRAUDULENT CONCEALMENT ............................ 36

XIII.  CLAIMS FOR RELIEF ................................... 37

**FIRST CAUSE OF ACTION**
    BREACH OF THE COVENANT OF GOOD FAITH
    AND FAIR DEALING (Against Defendants Ambac, MBIA,
    FGIC, XL Capital, ACA and CIFG) ............................ 37

**SECOND CAUSE OF ACTION**
    FRAUD AND DECEIT (Against Defendants Ambac, MBIA,
    FIGC, XL Capital, ACA and CIFG) ........................... 38

**THIRD CAUSE OF ACTION**
    BREACH OF CONTRACT (Against Defendants Ambac, MBIA,
    FIGC, XL Capital, ACA and CIFG) ........................... 39

**FOURTH CAUSE OF ACTION**
    NEGLIGENT MISREPRESENTATION (Against All
    Defendants) ............................................... 40

**FIFTH CAUSE OF ACTION**
    NEGLIGENCE (Against Defendants Ambac, MBIA, FIGC,
    XL Capital, ACA and CIFG) ................................. 41

**SIXTH CAUSE OF ACTION**
    VIOLATIONS OF CALIFORNIA CARTWRIGHT ACT
    (Against All Defendants) ................................... 42

**PRAYER FOR RELIEF** .......................................... 43

**JURY TRIAL DEMAND** ......................................... 45

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                          ii

Plaintiff City of Stockton (hereinafter referred to as "Stockton"), hereby brings this action for damages and relief against the Defendants (defined *infra*) for violations of California state common law and for violations of the California Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, *et. seq.*). Plaintiff complains and alleges upon information and belief except as to those paragraphs applicable to the Plaintiff, which are based on personal knowledge, as follows:

## I.

## INTRODUCTION

1.     This case involves the municipal bond insurance industry used by California municipalities to assist in the funding of public projects. California public entities spent hundreds of millions of dollars to buy bond insurance in order to sell municipal bonds needed for important public purposes, such as building schools, roads and hospitals. Due to the unlawful acts of the Defendants, cities and municipalities were forced to buy bond insurance, at the cost of hundreds of millions of dollars, money that belonged to California citizens. California cities and public entities should not have had to buy bond insurance that is now worthless in many respects due to the failing financial conditions of the bond insurance companies.

2.     The situation however, reached disaster levels when those same bond insurance companies, who took **hundreds of millions** of dollars in premiums from California public entities, then insured **hundreds of billions** of dollars of *subprime loans*. The insurer Defendants never disclosed the extent of their exposure to the subprime market but rather represented to Plaintiff Stockton and other California public entities that the bond insurance they were selling would improve their credit rating and lower the interest rate they would have to pay. In that way, the Defendants sold worthless bond insurance.

3.     "We know there was a concerted effort among supposed competitors to maintain the dual rating system and kill attempts at reform. There were

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  discussions amongst insurers aimed at retaining the dual rating system when at

2  least one rating agency suggested modifying or eliminating it. **The effect of these**

3  **activities was clearly to maintain prices and prop up the market for bond**

4  **insurance. Such misuse of market power and restraint of competition is**

5  **plainly anticompetitive and anti-taxpayer, causing direct harm to municipal**

6  **and state customers issuing bonds."** Connecticut Attorney General in testimony

7  before the House Committee on Financial Services on March 12, 2008.

8      4.   "For years, municipalities have been held to a higher standard than

9  corporate issuers. This differential treatment undermines the functioning of an

10  efficient and transparent capital market, a goal shared not just by investors and

11  issuers, but rating agencies as well. For investors, the current system greatly

12  inflates the risk of investing in municipal bonds relative to alternative investments,

13  leading to investment decisions that are not based on the best information. For

14  municipalities, the dual standard has **cost our taxpayers and ratepayers billions**

15  **of dollars** in increased interest costs and bond insurance premiums." Letter from

16  Hon. Bill Lockyer of California and 15 State Treasurers to Fitch Ratings, Moody's

17  Investor Services and Standard & Poor's dated March 4, 2008.

18      5.   States, municipalities and public entities issue bonds to fund critical

19  public projects like bridges, schools, roads, sewer plants, libraries, prisons and

20  drinking water systems. The interest rate paid on these bonds depends mainly on

21  the ratings assigned to the bonds by the Credit Rating Agencies. A bond rated

22  "AAA" will bear a lower interest rate than a bond rated "A." As such, the

23  taxpayers in a municipality with an "A" rating will pay substantially more interest

24  over the life of the bond, which can range up to 30 years. This constitutes a

25  significant cost to public entities, many of which rely extensively on municipal

26  bond proceeds to finance public works.

27      6.   Bond ratings are a grade given to bonds that indicate their credit

28  quality. The three major bond rating agencies in the country, Fitch Inc., Moody's

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                            3

1  Corporation, and Standard & Poor's ("Credit Rating Agencies"), provide these

2  evaluations which are supposed to be based upon bond issuer's financial strength,

3  or its ability to pay a bond's principal and interest in a timely fashion. Bond

4  ratings are expressed as letters ranging from "AAA," which is the highest grade, to

5  "C" (junk), which is the lowest grade. The rating services all use letter grades, but

6  use various combinations of upper- and lower-case letters to differentiate

7  themselves.

8      7.      In order for municipal entities to sell bonds at lower interest rates,

9  they are often required to enter into agreements with **bond insurance companies**.

10  In California, the largest municipal bond insurance companies are Ambac

11  Financial Group, Inc., MBIA Inc., XL Capital Assurance, Inc.,  ACA Financial

12  Guaranty Corp., Financial Guaranty Insurance Company, and CIFG Assurance

13  North America, Inc. (the insurer "Defendants"). The bond insurance company

14  provides a guarantee that they will cover interest payments and the principal

15  payment in the case of a default. This serves to lower the interest rate on a

16  municipal bond issuance. For this "service," the Defendant bond insurance

17  companies collect a fee from the public entities. Plaintiff has bought bond

18  insurance from the Defendant insurers.

19      8.      In simple terms, a public entity and a corporate entity may have the

20  same likelihood of defaulting on their debt. The purpose of a bond rating is to

21  inform investors of the likelihood of default on loans by different entities. As a

22  result of different rating systems, however, these two entities, who are otherwise

23  similar, may receive different ratings, *e.g.* the public entity may be rated "A" while

24  the corporate entity may be rated "AAA." Despite the fact that these entities

25  possess the same default risk, the public entity's borrowing costs are significantly

26  higher than the corporate entity. This is the result of the dual bond rating system

27  created by the Credit Rating Agencies which is now the subject of great debate

28  and investigation.

9.    Through this discriminatory system, public entities have been forced, and the taxpayers who support those public entities, to pay the insurer Defendants unnecessary insurance premiums. The difference between an uninsured bond issuance and an insured bond issuance for a municipal entity below "AAA" (which virtually all are) can amount to millions of dollars in increased interest paid to the purchasers of the bonds. California municipalities and public entities are forced to either pay higher interest rates on the issuance of a bond **or** pay fees to bond insurance companies. The Defendants conspired to maintain that dual rating system because they knew it was the backbone of their entire industry.

10.    The insurer Defendants are corporate insurance entities that are (or at least were) rated "AAA" under the corporate standard. When the insurer Defendants insure a bond offering their credit rating is associated with the bond rather than the credit rating of the issuer. In essence, a public entity with a lower default risk (the more trustworthy entity) has to pay the bond insurance company (the less trustworthy entity) millions of dollars in insurance premiums in order to receive the benefit of lower interest rates. This situation is not economically rational and serves as a detriment to public entities and has led to unnecessarily high borrowing costs for public entities and unlawful profits for the insurer Defendants.

11.    Insuring municipal bonds is an extremely low-risk business in which the insurer Defendants basically receive hundreds of millions of dollars for **doing nothing** as municipalities rarely, if ever, default. The default rate for municipal bonds is minuscule in comparison to corporations — the municipal bond default rate is 0.06 while the default rate on corporate bonds is 0.30 nationally over the past decade. In other words, corporate bonds, in general, are **five times** more likely to default than are municipal bonds.

12.    Most bond insurance companies would not even insure California public entities that had even a remote risk of default. The Securities Industry and

⊛
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                                5

Financial Markets Association Web site indicates that the insurer Defendants followed a "zero-loss" underwriting standard, in essence only insuring those municipal bonds that had a **zero percent** chance of defaulting and collecting fees to insure those bonds.

13.    This demanding standard that the insurer Defendants have levied against the Plaintiff and other California cities and municipalities is in complete contrast to their own irresponsible behavior in insuring hundreds of billions of dollars of high risk subprime mortgage instruments and other complex leveraged instruments based on subprime mortgage instruments.

14.    The recent wave of downgrades of all of the insurer Defendants demonstrates that the municipal bond insurance industry has been built on a deceptive foundation. All of the insurer Defendants not only insured the safe debt of public entities such as the Plaintiff Stockton, but recently started insuring risky subprime loans and structured financial products based on those subprime loans, including Collateralized Debt Obligations ("CDO"), all in the name of greed. At the end of 2007, bond insurance companies backed at least **$127 billion of CDOs** based on subprime loans. When these subprime loans began to fail, the risk incurred by the insurer Defendants in insuring these CDOs became starkly visible. Accordingly, as the credit ratings of the insurer Defendants were downgraded, the rating of bond issuances insured by the insurer Defendants were also downgraded. The insurer Defendants' highly risky involvement in the subprime markets was **never disclosed** by the Defendants to Plaintiff Stockton and other California cities and municipalities. If they had known that the insurer Defendants had billions of dollars in exposure to risky subprime and subprime-related instruments, Plaintiff **would not** have purchased bond insurance that has become basically worthless.

15.    With the revelation of the recent collapse of the subprime market and the security instruments that were based on the subprime market, the financial conditions of all of the insurer Defendants have suffered. The extent of the insurer

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

1    Defendants' extremely risky investments in subprime mortgage-backed securities

2    and insurance of risky subprime loans were never disclosed to the Plaintiff. Even

3    now, the news on a daily basis reveals more and more about the inability of the

4    bond insurance companies to support the promises they made to the Plaintiff and

5    other California cities and municipalities. Most of the insurer Defendants have

6    seen their credit ratings drop; at least two have dropped to junk status. The

7    municipal entities have proven to be far less likely to default than the insurance

8    companies that they paid to guarantee their debt. In short, Plaintiff paid insurance

9    premiums for nothing.

10        16.    As **bond insurance companies**, the insurer Defendants were

11    motivated to: (a) artificially lower the credit ratings of bond issuers (*i.e.*

12    municipalities and cities); (b) maintain their own high credit rating and (c) charge

13    high premiums for bond insurance. The insurer Defendants' entire business model

14    rested on these predicate facts. Without one or the other, the insurer Defendants

15    would not be able to receive the high premiums from Plaintiff Stockton and other

16    California municipal and public entities. The first goal was achieved by

17    conspiring to misuse their dominant control of the bond insurance market to

18    perpetuate and maintain the dual bond rating system. The second goal was

19    achieved by failing to disclose their true risk profile by recklessly endangering

20    their "AAA" status by insuring subprime loans and investing in exotic subprime

21    financing instruments.

22        17.    The insurer Defendants misled Plaintiff Stockton by failing to

23    disclose the full extent of their investment in subprime mortgage-backed securities

24    and their insurance of subprime instruments. Those agreements greatly

25    jeopardized the financial condition of the insurer Defendants. As a direct result of

26    being misled, Plaintiff entered into bond insurance agreements with entities that

27    were in substantially worse financial condition than California public entities,

28    such as Plaintiff Stockton, believed. As such, Plaintiff suffered harm from paying

1   unnecessary premiums and costs for bond insurance from financially weak

2   companies. Plaintiff Stockton paid a premium to acquire a certain product

3   (insurance from a triple-A rated entity) that, due to the wrongdoing of the

4   Defendants, is no longer the same product it thought it had acquired.

## II.

## NATURE OF THE ACTION

7       18.    This action arises from the illegal and unlawful acts of the Defendants

8   in selling bond insurance to Stockton while offering little or no benefits in reality.

9   The Defendants conspired to maintain and perpetuate the dual rating system in

10  order to force California public entities to purchase bond insurance. The

11  Defendants compounded this wrongdoing by recently insuring hundreds of

12  billions of dollars of subprime loan instruments and failing to disclose that fact to

13  the Plaintiff and other California public entities. These two factors combined to

14  cause harm to Plaintiff Stockton, forcing them to spend millions of taxpayer

15  dollars for worthless bond insurance. As a result, Plaintiff paid unnecessary

16  premiums and costs because of the conduct of the insurer Defendants.

17      19.    The misconduct of the Defendants was solely for the financial benefit

18  of the Defendants. In the face of the downgrading of the insurer Defendants,

19  Moody's has now all but admitted that the dual rating system is flawed and is

20  overhauling and updating all of its municipal bond ratings. Initial estimates

21  suggest that a large number of municipalities and public entities that were

22  formerly below "AAA" (and thus had to buy bond insurance) will be rated

23  "AAA." Standard & Poor's has now upgraded more than 5,000 municipal bonds

24  and has indicated further upgrades may be forthcoming. This dual rating system,

25  which was illegally propped up by the bond insurance companies, was unfair.

26  Even accepting the system as unfair, the insurer Defendants had no business

27  exposing themselves to hundreds of billions of dollars of high risk sub-prime

28  liability while simultaneously insuring municipal bonds.

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

COMPLAINT                                                                          8

# III.

## JURISDICTION AND VENUE

20.   Defendants, and each of them, are subject to the jurisdiction of this Court by virtue of their business dealings and transactions in California, by having caused injuries through their acts and omissions throughout the State of California, and by their violation of California state common law and the Cartwright Act, Business & Professions Code §§ 16700, et seq.

21.   This Court has subject matter jurisdiction over all causes of action asserted herein pursuant to Article VI, § 10 of the California Constitution. Each cause of action asserted, including claims alleging violations of the Cartwright Act, arises exclusively under the laws of the State of California. No part of this complaint arises under federal law, is preempted by federal law, implicates any filed rate, or challenges conduct within any federal agency's exclusive domain, and adjudication thereof has not been statutorily assigned to any other court or jurisdiction.

22.   The damages suffered by the Plaintiff exceed this Court's jurisdictional minimum.

23.   Each Defendant has sufficient minimum contacts within California to make the exercise of jurisdiction over each Defendant by California courts consistent with traditional notions of fair play and substantial justice. Each Defendant participates, or during the relevant period did participate, in the California market through the sale of municipal bond insurance to California state and local municipalities and public entities.

24.   Venue is proper because certain of the Defendants resided, transacted business, were found, or had agents in this county, and because San Francisco is the nearest major metropolitan area to Stockton where most of the Defendants maintain a major office presence. Several of the Defendants are citizens of the State of California, including Defendants Jason Kissane and Neil Pack. All of the

1  Defendants do substantial business in the State of California and are thus subject
2  to personal jurisdiction in California state court. The Plaintiff in this action is a
3  California public entity that has suffered financial losses due to the unlawful
4  conduct of the Defendants. The monies lost are those of Stockton residents.

IV.

**PARTIES**

**A.    Plaintiff**

25.    Plaintiff **City of Stockton ("Stockton")** is a California public entity
that has issued municipal bonds and has bought municipal bond insurance from
the insurer Defendants in the State of California. The City of Stockton has
suffered losses from the acquisition of bond insurance from the insurer
Defendants. The City of Stockton alleges that the premiums and costs that it was
forced to pay in order to acquire bond insurance was subject to the unlawful and
illegal acts of the Defendants.

**B.    Defendants**

26.    **Ambac Financial Group Inc. ("Ambac")** is a Delaware corporation
with its principal place of business in New York, NY. Ambac's principal
operating subsidiary, Ambac Assurance Corporation, is a guarantor of public
finance and structured finance obligations. Ambac sold bond insurance to
Plaintiff Stockton. Ambac is one of the largest providers of municipal bond
insurance in the State of California.

27.    **MBIA Inc. ("MBIA")** is a Connecticut corporation with its principal
place of business in Armonk, NY. MBIA sold bond insurance to Plaintiff
Stockton and is one of the largest providers of municipal bond insurance in the
State of California.

28.    **XL Capital Assurance Ltd. ("XL Capital")** is a wholly-owned
subsidiary of Security Capital. Its principal place of business is located in New
York, NY. XL Capital sold bond insurance to California public entities in the

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1 State of California. XL and its parents and subsidiaries are one of the largest
2 providers of municipal bond insurance in the State of California.

3       29.    **ACA Financial Guaranty Corporation ("ACA")** is a subsidiary of
4 ACA Capital Holdings, Inc., which has its principal place of business in New
5 York, NY. ACA sold bond insurance to California public entities in the State of
6 California and is one of the largest providers of municipal bond insurance in the
7 State of California.

8       30.    **Financial Guaranty Insurance Company ("FGIC")** is a New York
9 corporation with its principal place of business in New York, NY. FGIC is a
10 subsidiary of FGIC Corporation, a Delaware corporation. FGIC sold bond
11 insurance to Plaintiff Stockton and is one of the largest providers of municipal
12 bond insurance in the State of California.

13       31.    **CIFG Assurance North America, Inc. ("CIFG")** is a New York
14 corporation with its principal place of business at 825 Third Avenue, 6th Floor,
15 New York, NY 10022. CIFG is a subsidiary corporation of CIFG Guaranty, Ltd.,
16 a French *societe anonyme*. CIFG sold bond insurance to California public entities
17 in the State of California. CIFG is one of the largest providers of municipal bond
18 insurance in the State of California.

19       32.    **Jason Kissane ("Kissane")** is a citizen of California and is a
20 managing director of MBIA's Global Public Finance Division and head of the
21 company's San Francisco office. As the head of MBIA's San Francisco office,
22 Mr. Kissane oversees MBIA's new business activities in the western region of the
23 United States and manages MBIA's insurance business in the western United
24 States including that of Stockton. As managing director of MBIA's Global Public
25 Finance Division, Mr. Kissane knew of MBIA's actual exposure to the subprime
26 markets, an exposure that jeopardized the insurance product he and his division
27 were selling to California public entities. Mr. Kissane also knew and acted in

28

1  concert with the other Defendants to maintain the dual rating system. Mr. Kissane
2  is a resident of San Francisco.

3      33.    **Neil Pack ("Pack")** is a citizen of California and is the managing
4  director and head of the US Public Finance - Western Region division of
5  Defendant CIFG. Mr. Pack operates out of CIFG's office in San Francisco,
6  California. Prior to joining CIFG, Mr. Pack spent five years as a managing
7  director at Defendant XL Capital. Mr. Pack is responsible for CIFG's municipal
8  bond insurance business in the western United States including that of Stockton.
9  As a managing director at both Defendant XL Capital and Defendant CIFG, Mr.
10  Pack knew of the massive exposure to the subprime markets that both Defendant
11  XL Capital and Defendant CIFG possessed, an exposure that jeopardized the
12  product he and his division was selling to California public entities. Mr. Pack also
13  knew and acted in concert with the other Defendants to maintain the dual rating
14  system. Mr. Pack is a resident of Contra Costa County.

15      34.    **Ambac, MBIA, XL Capital, ACA , FGIC, CIFG, Kissane and**
16  **Pack** are referred to throughout as the **Defendants**.

17  **C.**    **Doe Defendants**

18      35.    Except as described herein, Plaintiff is ignorant of the true names of
19  Defendants sued as Does 1 through 50 inclusive and, therefore, sues these
20  Defendants by such fictitious names. Plaintiff will seek leave of the Court to
21  amend this complaint to allege their true names and capacities when they are
22  ascertained.

23      36.    Plaintiff alleges that each of these Doe Defendants is responsible in
24  some manner for the acts and occurrences alleged herein, and that Plaintiff's
25  damages were caused by such Doe Defendants.

26  **D.**    **Credit Rating Agencies**

27      37.    **Fitch Inc. ("Fitch")**, which does business in California as Fitch
28  Ratings, is a Delaware corporation with headquarters in New York, NY and in

1  London, England.  Fitch is part of the Fitch Group, which is a subsidiary of

2  France-based Fimalac.  Fitch is one of the three major municipal bond rating

3  agencies.

4      38.     **Moody's Corporation ("Moody's")** and its subsidiary Moody's

5  Investment Service, Inc. are Delaware corporations with their principal place of

6  business in New York, NY.  Moody's is one of the three major municipal bond

7  rating agencies.

8      39.     **Standard and Poor's ("S&P")** is a division of McGraw-Hill

9  Companies, Inc. and has its principal place of business in New York, NY.  S&P is

10  one of the three major municipal bond rating agencies.

11     40.     **Fitch, Moody's** and **S&P** are referred to throughout as the **Credit**

12  **Rating Agencies.**

13  E.    **Agents and Co-Conspirators**

14     41.     At all times relevant to this complaint Defendants, and each of them,

15  were acting as the agents, employees, and/or representatives of each other, and

16  were acting within the course and scope of their agency and employment with the

17  full knowledge, consent, permission, authorization and ratification, either express

18  or implied, of each of the other Defendants in performing the acts alleged in this

19  complaint.

20     42.     As members of the conspiracies alleged below, each of the

21  Defendants participated and acted with or in furtherance of said conspiracy, or

22  aided or assisted in carrying out the purposes of the conspiracy, and have

23  performed acts and made statements in furtherance of the conspiracy and other

24  violations of California law.

25     43.     Each of the Defendants acted both individually and in alignment with

26  other Defendants with full knowledge of their respective wrongful conduct.  As

27  such, the Defendants conspired together, building upon each other's wrongdoing,

28  in order to accomplish the acts outlined in this complaint.

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                13

44.   Defendants are individually sued as principals, participants, and aiders and abettors in the wrongful conduct complained of and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

## V.

## WRONGDOING CENTERED IN SAN FRANCISCO

45.   Plaintiff Stockton has suffered harm from the wrongful acts of the Defendants. California is the largest municipal bond issuer in the United States with about $43.7 billion of general obligation debt outstanding. According to the California State Treasurer, in 2007 alone, the State of California sold $12.1 billion of general obligation bonds. Add the outstanding general obligation debt of California cities, counties, districts and other public entities, and it is easily the biggest and most lucrative market in the country for municipal bond insurance. As such, the totality of the harm addressed in this complaint has been suffered by California taxpayers and the residents of Stockton in particular.

46.   All of the insurer Defendants conduct a good portion of their business in San Francisco. Indeed, while formally headquartered across the world, all of the insurer Defendants conduct significant business in California. Due to the sheer size of the California municipal bond market, all of the insurer Defendants operate in the State of California and the majority of the Defendants operate major offices in the **financial district of San Francisco**. It is here that the locus of the unlawful conduct against California cities and municipalities is directed from. For example:

47.   **MBIA Inc.** registered on June 29, 1989 with the California Secretary of State. MBIA maintains a California office at **150 California Street, 20th Floor, San Francisco, CA 94111**. According to the MBIA website, the San Francisco office is the home of MBIA's Global Public Finance Division. The San Francisco

1  office is responsible for MBIA's marketing and insurance operations in the

2  western United States including Plaintiff Stockton.

3      48.   **XL Capital Assurance Inc.** registered on October 10, 2001 with the

4  California Secretary of State. XL Capital Assurance Inc. maintains a California

5  office at **595 Market Street, Suite 2210, San Francisco, CA 94105.**

6      49.   **CIFG Assurance North America, Inc.** registered as a business

7  entity on September 17, 2003 with the California Secretary of State. CIFG

8  Assurance North America, Inc. maintains a California office at **Spear Tower, One**

9  **Market Street, Suite 3500, San Francisco, CA 94105.**

10      50.   **Ambac Assurance Corporation** registered on September 28, 1971

11  with the California Secretary of State.

12      51.   **ACA Financial Guaranty Corporation** registered on April 16, 1987

13  with the California Secretary of State.

14      52.   **Financial Guaranty Insurance Company** registered on July 28,

15  1972 with the California Secretary of State.

16  **VI.**

17  **OVERVIEW OF THE MUNICIPAL BOND MARKET**

18  **A.**   **Municipal Bonds**

19      53.   Municipal bonds are issued by Stockton and other California cities

20  and counties to raise funds for various public projects, including the construction

21  and repair of roads and building public structures such as schools, parks, power

22  plants and mass transit. Municipal bonds are tax-exempt and as a result, investors

23  are usually willing to accept lower interest rates from municipal bonds than they

24  would accept from other forms of borrowing (assuming comparable risk).

25      54.   Municipal bonds bear interest at either a fixed or variable rate of

26  interest. The issuer of a municipal bond receives the proceeds of all or part of the

27  bond at the time of issuance. In return, the issuer agrees to repay the principal and

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  the interest to the bond holders over time. Repayment periods vary and may be as

2  short as a few months but typically last for several years.

3      55.    Revenue bonds are a form of long-term borrowing in which the debt

4  obligation is secured by a revenue stream produced by the project being financed.

5  Lease-revenue bonds are a variant of revenue bonds used in the state's capital

6  outlay program. The revenue stream backing the bond is usually created from

7  lease payments made by the occupying department to the governmental financing

8  entity which constructs the facility. The financing authority constructs the facility,

9  issues financing bonds, and retains title to the facility until the debt is retired.

10      56.    The municipal bond industry is extremely large. According to the

11  Securities Industry and Financial Markets Association, approximately $385 billion

12  worth of municipal bonds were issued in 2006. The total United States municipal

13  bond market is currently valued at approximately $2.6 trillion. At any time,

14  California has several thousand bond issuances outstanding. The total market

15  value of the California bond market is approximately $200 billion or more. In the

16  last year, it is estimated that public entities in California issued approximately $20

17  billion of municipal bonds.

18  **B.    History of Bond Ratings**

19      57.    In 1909, John Moody introduced a simple grading system for railroad

20  bonds, which was broadened a few years later to include all industrial bonds. John

21  Moody's grading system was one of the precursors to the modern system of rating

22  security instruments.

23      58.    Poor's Publishing was second in the business in 1916; Standard

24  Statistics followed in 1922. The two companies merged in 1941, forming

25  Standard & Poor's, which was absorbed by McGraw-Hill in 1966. In 1924, Fitch

26  Publishing made its entrance into the industry. The value of the ratings companies

27  for investors was based on the theory that ratings provided by presumptively

28

objective voices of expertise would assist bond investors in determining which companies were good credit risks and which were bad risks.

59.     The 1930s brought the first major change that affected the industry. In the early 1930s, bank regulators began to make judgements about the soundness of banks based on the quality of corporate bonds in which the banks had invested. By 1936, regulators had settled on a requirement that banks could not invest in bonds that were below "investment grade." These changes in bank regulation were followed in the 1930s and 1940s by changes in state regulatory requirements for insurance companies that linked those firms' capital requirements to the ratings of the bonds in the companies' investment portfolios.

60.     The next major change for the industry came in the early 1970s, when the industry changed its business model from the "investors pay" model to an "issuers pay" model. The other changes of the 1970s occurred in 1975. The SEC wanted to use bond ratings as a basis for credit quality determinations. Therefore, the SEC created a new regulatory category, "nationally recognized statistical rating organizations" (NRSROs). The three rating company incumbents, Moody's, S&P and Fitch, were immediately "grandfathered" into the NRSRO category. For the next 25 years, the SEC designated only four additional firms as NRSROs. However, mergers among them reduced the net number of NRSRO firms back to the **original three.**

C.     **History of Municipal Bond Insurance**

61.     Bond insurance is a service where issuers of a bond can pay a premium to a third party, who will then provide interest and capital repayments as specified in the bond in the event that the issuer fails to do so. This in turn raises the rating of the bond to the rating of the insurer. The bond insurer's credit rating must be very good in order for this to happen. The premium requested for insurance on a bond is a measure of the perceived risk of failure of the issuer. Municipal bond insurance was introduced in the US in the early 1970's.

62.    The first monoline insurer, Ambac Financial Group, Inc., was formed in 1971 as an insurer of municipal bonds. The second major monoline insurer, MBIA, Inc. was formed in 1973. Today, Ambac and MBIA are the largest insurers of municipal bonds in California.

63.    In recent years, much of the monolines' growth has come in structured products, such as asset backed bonds and collateralized debt obligations (CDOs), and the total outstanding amount of paper insured by monolines reached $3.3 trillion in 2006. By insuring these risky investments, the municipal bond insurers seriously jeopardized their own creditworthiness and created problems for the California public entities that purchased insurance from them, as detailed below.

## VII.

## THE DEFENDANTS HAVE ENGAGED IN UNLAWFUL CONDUCT

64.    The insurer Defendants have conspired to maintain the dual rating system and thwart any attempts to reform the system. The insurer Defendants, not content to take advantage of the dual rating system to sell bond insurance, also collected millions of dollars in premiums in order to insure billions of dollars of subprime-based instruments. At first, the insurer Defendants collected record profits. However, as the subprime loans defaulted, the insurer Defendants found their financial condition seriously jeopardized and the product they sold to the Plaintiff Stockton becoming worthless in many respects.

### A.    Municipal Bonds are Rated by Credit Rating Agencies

65.    Municipal bonds are given bond ratings by the Credit Rating Agencies. These bond ratings have a direct effect on the interest rates that California cities and municipalities can obtain from the sale of municipal bonds. These bond ratings directly affect the borrowing costs of California cities and municipalities, including the Plaintiff. As a result of the dual bond rating system, Stockton was forced to purchase unnecessary bond insurance from the insurer Defendants (because it was unfairly rated lower than corporate entities)

66.    According to economists and reports generated by the Credit Rating Agencies, S&P and Moody's each control 40% of the credit rating market. Fitch controls 15%. The three entities combined control approximately 95% of the credit rating market.

67.    Rating agencies have held municipal bond issuers to a higher standard than corporate issuers. Unlike corporate issuers, municipal bond issuers are not graded on the risk of default. Municipal entities in general rarely, if ever, default. Nonetheless, public entities issuing municipal bonds are universally given lower bond ratings than similar corporate bonds. This disparity is not merely cosmetic. In fact, it costs California taxpayers hundreds of millions of dollars in the form of either higher interest rates or in the form of premiums and costs related to acquiring municipal bond insurance.

68.    The dual system of bond ratings is misleading and misguided – costing California taxpayers billions of dollars in high interest rates and unnecessary costs and premiums. If investors were properly informed of the significantly lower risk of default on municipal bonds, Plaintiff Stockton and other California cities and municipalities would not have to buy municipal bond insurance.

69.    As a result of the credit rating system it is impossible for any entity, municipal or corporate, to issue a bond without a rating. In addition, the market makes it nearly impossible to issue a bond without a "AAA" rating. Hence, the need to buy bond insurance. In essence, the dual rating system serves the sole purpose of propping up the market for bond insurance. As such, the Defendants have every economic motive and incentive to conspire to maintain and perpetuate the dual rating system. Without it, the entire core business model of the bond insurance companies (a core business model they moved away from) fails.

70.    According to the *Los Angeles Times*, tax-free, fixed-rate general obligation bonds issued by cities, counties and local government agencies are

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1    generally so safe that all would be rated "AAA" if judged on the same scale as

2    corporate bonds by the Credit Rating Agencies.  Moody's recent announcement

3    that it may align municipal bond ratings with corporate ratings included an

4    acknowledgment that thousands of cities and municipalities would be upgraded to

5    "AAA" if this alignment occurs.  However, the dual rating system penalizes

6    municipal bonds under the pretense that state and local government bonds are

7    riskier investments compared to corporate debt.

8        71.    According to Municipal Market Advisors, a respected independent

9    strategy and consulting firm in the insurance industry, corporate bonds with

10   "AAA" ratings, the highest available, have defaulted at *ten times* the rate of

11   municipal bonds rated "A", a much lower grade.

12       72.    Studies by the Credit Rating Agencies themselves show that

13   municipal bonds are much less likely to default than corporate bonds.

14       73.    For example, municipal bonds rated Baa by Moody's have

15   experienced a default rate of 0.13 percent compared to a 0.52 percent default rate

16   for corporate bonds that are rated Aaa.  In other words, higher rated corporate

17   bonds are **four times more likely to default** than lower rated municipal bonds.

18       74.    Corporate bonds rated AAA by S&P have defaulted at **twice** the rate

19   of lower rated BBB municipal bonds.  S&P's historical rate of default of A-rated

20   municipal bonds is .23 percent while the historical rate of default of A-rated

21   corporate bonds is **thirteen times** higher at 2.91 percent.

22   B.    **The Bond Insurance Companies Reap Illegal Profits**

23       75.    Because of the dual rating system, Stockton and other California

24   public entities could only obtain a "AAA" rating by purchasing bond insurance

25   from the insurer Defendants, thereby assigning the "AAA" ratings of those

26   insurers to the municipal bond.  The insurers themselves have been rated "AAA"

27   on the corporate scale and in effect transfer the top rating to public entities through

28   the policies they sell.  The profits are enormous – public entities with lower ratings

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                    20

1  paid $2.5 billion in premiums for bond insurance in 2007, according to the *New*

2  *York Times*.

3      76.    The California State Treasurer has said that to bring up its ratings to

4  what they should have been in the first place, the State of California alone (not

5  including California cities and municipalities such as Plaintiff Stockton) paid $102

6  million from 2003 to 2007 to buy "AAA" bond insurance on its general obligation

7  bonds, allowing the state to sell the bonds at a lower interest rate. It would have

8  been unnecessary to spend the $102 million if the bonds had been rated by the

9  same criteria as non-municipal debt and there was a competitive market.

10      77.    "Municipal issuers buy insurance on their bonds to obtain a triple-A

11  rating that, in many cases, *they already deserve*," Bill Lockyer told the House

12  Financial Services Committee. He went on to state that, "[i]f the state of

13  California received the triple-A rating it deserved, we could reduce taxpayer's

14  borrowing costs hundreds of millions of dollars."

15      78.    If California's general obligation bonds received the triple-A rating

16  they deserved, California taxpayers and the State's general fund could save

17  anywhere up to **$5 billion in interest rates over the 30-year life of the bonds**.

18      79.    According to an analyst at Municipal Market Advisors, U.S.

19  taxpayers may pay as much as **$3.6 billion extra** on bonds sold in 2006 because of

20  the different rating standards between municipalities and corporations.

21  Bloomberg.com, March 2008.

22  **C.**    **Conspiracy in the Bond Insurance Industry**

23      80.    The insurer Defendants **pay annual fees** to the Credit Rating

24  Agencies for the right to obtain ratings. The insurer Defendants and the Credit

25  Rating Agencies also do significant business together. Through their interlocking

26  business relationships with the Credit Rating Agencies and the fees they pay to the

27  Credit Rating Agencies, the insurer Defendants act to perpetuate and prop up the

28  unfair dual rating system that underpins the entire bond insurance market.

1  According to agreements between the insurer Defendants and the Credit Rating

2  Agencies, the fees paid to the Credit Rating Agencies **increase** as the insurance

3  portfolios **increase** for the bond insurance companies. Issuers of securities are

4  required to pay the Credit Rating Agencies for them to provide a special rating for

5  an "insured offering", *i.e.* issuers are forced to pay the Credit Rating Agency to

6  give them a new "AAA" rating **after** they have already paid the issuer Defendants

7  for the bond insurance.

8      81.    According to the Connecticut Attorney General, the issuer

9  Defendants have used their complete market power to maintain the dual rating

10  system. In order to maintain their business model and reap hundreds of millions of

11  dollars in profits, bond insurers colluded to pressure Credit Rating Agencies to

12  maintain the dual rating system. They did so in restraint of trade, acts that have

13  caused great harm to Plaintiff Stockton and other California public entities. If not

14  for the subprime explosion that laid bare the fundamentally unfair nature of the

15  bond insurance industry, the scheme of the Defendants would have likely

16  continued. The Defendants' conspiracy not only perpetuated and maintained the

17  dual rating system, it also permitted the insurer Defendants to charge excessively

18  high insurance premiums in order to receive the illusory benefit of a "AAA"

19  rating.

20      82.    U.S. Rep. Michael E. Capuano, a member of the House Committee on

21  Financial Services, described municipal bond insurance as "legal extortion" of

22  cities and states, and said insurance issuers have "stolen billions, if not trillions, of

23  taxpayers dollars from their pockets."

24  **D.    The Defendants Failed to Disclose Their True Financial Condition and**

25      **Risk Exposure to Plaintiff**

26      83.    The insurer Defendants have further harmed Plaintiff Stockton and

27  California municipalities and engaged in unlawful and illegal acts by failing to

28  disclose to the Plaintiff their exposure to the subprime industry. As the insurers of

1 Stockton's municipal bonds, the insurer Defendants had a duty not to act

2 recklessly and jeopardize their ability to comply with their insurer obligations. If

3 they had fully disclosed their risky and uncertain financial condition, Plaintiff

4 would not have purchased bond insurance from one or more of the insurer

5 Defendants. In the current declining market, Stockton and California public

6 entities have found that the bond insurance they have purchased is close to

7 worthless.

8      84.    A substantial factor in causing the losses suffered by the Plaintiff is

9 the fact that the insurer Defendants, such as Ambac and MBIA have either lost or

10 are in danger of losing their "AAA" corporate standard bond rating and interest

11 rates are rising. Indeed, the insurer Defendants, such as MBIA and Ambac need

12 the fees and costs from municipal bond insurance in order to be able to shore up

13 their own financial conditions. The insurer Defendants' credit ratings and their

14 financial viability have been seriously damaged due to the recent subprime crisis

15 and the losses suffered on mortgage-backed securities.

16      85.    The Defendant insurers earned record profit margins from insuring

17 safe municipal bonds. Between 2002 and 2007, MBIA's average profit margin

18 was 39 percent while Ambac's average profit margin was 48 percent. However, it

19 was not enough. In pursuit of even greater profits, the Defendant insurers dove

20 into the CDO business, insuring **hundreds of billions of dollars** of CDOs backed

21 by subprime loans, seriously jeopardizing their core business: insuring and

22 protecting safe municipal bonds.

23      86.    According to a principal at Capital Markets Management LLC, "It

24 (CDOs) looked so profitable and so easy that they let the portfolio shift too far

25 toward structured finance." He described CDOs as follows:"It morphed into this

26 monster that is devouring them."

27      87.    H. Russell Fraser, one of the founders of Defendant ACA objected to

28 ACA's decision to heavily enter the CDO market. According to Mr. Fraser, he left

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  the company due to a dispute over the riskiness of ACA's decision to enter into

2  the CDO market. Mr. Fraser stated, "I knew that if they played with fire long

3  enough, they were going to get burned." ·

4      88.    The insurer Defendants insured hundreds of billions of dollars worth

5  of high risk CDOs (essentially packaged subprime loans). By packaging these

6  products, financial institutions were able to transform extremely high-risk

7  subprime paper into illusory "AAA" paper. Oftentimes the largest holding of

8  some CDOs was even more CDOs. For example, Ambac insured $1.9 billion of a

9  CDO called Ridgeway Court Funding II Ltd. whose holdings included Carina

10  CDO Ltd., a CDO that was being liquidated in January of 2008. Ridgeway also

11  had exposure to **three other CDOs**, 888 Tactical Fund Ltd., Pinnacle Peak CDO

12  Ltd. and Octonion CDO. Ltd., all of which had exposure to each other and to

13  Carina CDO Ltd. In essence, Ambac's hugely risky $1.9 billion gamble was

14  multiplied tenfold due to the interlocking business relationships of these CDOs.

15      89.    The insurer Defendants entered into the CDO markets out of greed,

16  attracted by the high premiums they could charge while having to set aside very

17  little capital. The Defendant insurers agreed to insure CDOs for billions of dollars

18  even when they knew that **no reliable default rate data existed**. What the

19  Defendant insurers were doing was putting at risk their municipal clients, such as

20  Stockton, by backing hundreds of billions of dollars of high risk loans (without

21  any dependable default rate data) and failing to disclose that exposure. A

22  managing director at New York-based research firm Graham Fisher & Co. was

23  quoted as stating, "They lost their way out of greed." Bloomberg Markets, March

24  2008.

25      90.    In the past, a managing partner at Pershing Square Capital

26  Management LP challenged the insurer Defendants' business, stating that he

27  believed that the Defendant insurers had larger mark-to-market losses on CDOs

28  than they were disclosing, were underreserving against possible losses and didn't

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                            24

1    deserve their AAA ratings.  MBIA's CEO responded firmly, stating that "We

2    stand firmly by the soundness of our book of business and the quality of our

3    underwriting."

4        91.    By chasing the higher profits of CDOs while underestimating the

5    risks, the bond insurers jeopardized their basic business: insuring municipalities

6    against default.

7        92.    Beginning at the end of 2007, Defendant Ambac began to

8    acknowledge serious deterioration in its CDO portfolio and indicated it had more

9    exposure to anticipated losses and defaults related to its CDO contracts than

10   previously disclosed.

11       93.    On October 24, 2007, Ambac issued a press release entitled, "Ambac

12   Financial Group, Inc. Announces Third Quarter Net Loss of ($360.6) Million;

13   Included Previously Announced $743 Million Unrealized Mark-to-market Loss on

14   Credit Derivative Portfolio; Third Quarter Net Loss Per Diluted Share of ($3.51);

15   Third Quarter Credit Enhancement Production $31.1 million, up 99%."

16       94.    In December of 2007, MBIA announced that it had $8.1 billion in

17   exposure to complex and risky securities backed by home loans.

18       95.    In January of 2008, Fitch downgraded Ambac from "AAA" status to

19   "AA" status.

20       96.    That same month, Fitch said that it was downgrading Defendant

21   Security Capital because of its expected losses on structured finance collateralized

22   debt obligations ("CDO") backed by subprime residential mortgage backed

23   securities ("RMBS").

24       97.    Moody's and S&P have both placed Ambac and MBIA on negative

25   outlook and are seriously reviewing the financial conditions of both companies.

26   Both Moody's and S&P are considering further downgrades of the credit rating of

27   Ambac and MBIA.

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                    25

98.    In February of 2008, MBIA announced $2.3 billion in losses for the fourth quarter of 2007 on $3.5 billion of write-downs in its insured credit derivatives portfolio.

99.    In March of 2008, Defendant Security Capital was downgraded to junk status by Fitch, citing serious capital concerns related to the subprime crisis. At the end of last year, SCA was one of seven bond insurers with the highest AAA rating. This collapse has caused monetary harm to the public entities that had bought bond insurance from the insurer Defendants.

100.    In April of 2008, Fitch downgraded MBIA from "AAA" status to "AA" status.

101.    In May of 2008, Defendant MBIA reported a net loss of $2.4 billion, reflecting a $3.6 billion unrealized mark-to-market fall in value on the credit default swaps used by MBIA to insure structured finance credits. MBIA has also announced it is contributing $900 million to its financial guaranty subsidiary.

102.    On May 20, 2008, Moody's announced it was downgrading CIFG to "Ba2", which is below investment grade. Moody's announced it was downgrading CIFG because it believed that CIFG would fail to meet minimum regulatory capital requirements due to losses suffered from CDOs.

103.    In May of 2008, Defendant FGIC reported that it had lost an additional $33.4 million in the first quarter of 2008 in covering its book of CDOs. FGIC reported that $279.2 million was set aside to cover losses on CDOs of mortgages written from 2005 through 2007. A year ago, Defendant FGIC had reported earnings of $68.5 million and was still rated "AAA" by all three Credit Rating Agencies. In May of 2008, Defendant FGIC was rated Baa3 by Moody's, BB by S&P and BBB by Fitch.

104.    On May 28, 2008, Defendant Ambac announced it was writing down an additional $228 million in mark-to-market adjustments on CDO's of asset-backed securities. These losses, similar to the losses suffered by all of the

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

COMPLAINT

1    Defendant bond insurance companies, were not appropriately disclosed to the

2    Plaintiff.

3        105.   On June 4, 2008, Moody's announced it was reviewing the financial

4    conditions of Defendants Ambac and MBIA and was seriously considering

5    downgrading both companies because of the magnitude of their losses from

6    insuring risky subprime-related instruments in comparison to their assets.

7    Moody's indicated it had serious questions regarding the ability of Defendants

8    Ambac and MBIA to fulfill their financial obligations as bond insurers.

9        106.   The next day, on June 5, 2008, S&P announced it was downgrading

10   both Defendants Ambac and MBIA to "AA" from "AAA", citing financial

11   weakness and loss of business.  Prior to the recent credit rating downgrades,

12   Ambac and MBIA were the two largest monoline insurers in the United States.

13       107.   Four days later, on June 9, 2008, S&P announced it was downgrading

14   Defendant XL Capital further into junk bond status, rating it "BBB-" and on

15   negative credit watch.  That same day, S&P downgraded Defendant CIFG to "A-"

16   and placed Defendant FGIC's "BB" rating on CreditWatch with negative

17   implications.

18       108.   On June 19, 2008, Defendants Ambac and MBIA, the two largest

19   bond insurance companies in the State of California, both lost their last triple A

20   rating when Moody's downgraded both companies.  Defendant Ambac was

21   downgraded from Aaa to Aa3 with a negative outlook while Defendant MBIA was

22   downgraded to A2.

23       109.   The next day, Moody's announced that it was downgrading

24   Defendant FGIC from Baa3 to B1.  Moody's also downgraded FGIC's parent,

25   FGIC Corporation from B3 to Caa2.  That same day, Moody's also downgraded

26   Defendant XL Capital to B2 with a negative outlook from A3.  Moody's also

27   downgraded Defendant XL Capital's parent company, Security Capital Assurance

28

⊕
LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                              27

1  to Ca from B3. This downgrade lowered both Defendant FGIC and XL Capital's

2  credit ratings to junk status.

3     110.   Richard Larkin, research director at brokerage Herbert J. Simons &

4  Co. in Iselin, New Jersey and the former chief municipal rating officer at S&P,

5  described this as "a watershed moment in the municipal bond industry." Mr.

6  Larkin further stated that, "[t]he bond insurers have lost a tremendous amount of

7  credibility." Bloomberg.com, March 2008.

8     111.   A principal of Pershing Square Capital stated, "What's significant

9  about ACA is that it's the first monoline to blow up. There's nothing materially

10  different about Ambac, FGIC, MBIA or XL Capital. They all have the same

11  problem, that they are highly leveraged, have risky exposures and inadequate

12  reserves."

13     112.   The Defendant insurers have reaped hundreds of millions of dollars in

14  fees from California cities and municipalities and cannot now provide the

15  "service" that they claimed that they were providing. Indeed, the only reason

16  Plaintiff Stockton was forced to pay for this "service" was due to the dual rating

17  system.

18     113.   The current situation in the financial markets demonstrates that the

19  Defendants' scheme has forced the more responsible party (public entities) to pay

20  the less responsible party (bond insurance companies) hundreds of millions to

21  acquire a guarantee from the less responsible party. This is akin to paying the

22  fiscally irresponsible younger brother to insure the debt of the responsible older

23  brother.

24     114.   Mr. Fraser, the founder of Defendant ACA stated that, "[t]here's no

25  reason for an AAA-rated bond insurer to be doing anything with subprime

26  mortgages." He continued by stating, "It's going to hurt their business because

27  municipalities are going to ask, 'Is this insurance really worth it?'" With the full

1   extent of the subprime debacle still being uncovered, the answer is increasingly
2   appearing to be "No."

3      115.   For example, California's costs on $100 million of bonds that were
4   issued in 2002 and insured by Security Capital *increased*. The annualized rate on
5   these bonds went up to 6.22 percent on February 20, 2008 because these bonds
6   were guaranteed by Security Capital, which was downgraded. A year earlier, the
7   annualized rate on these bonds was 3.55 percent.

8      116.   The injuries caused by the mortgage defaults have spread throughout
9   the financial system. Municipal bond insurers have lost their triple-A rating or are
10  in serious danger of losing their triple-A rating. Investment funds, such as money
11  market funds and hedge funds are forced to unload municipal bond debt because
12  of both internal rules and, more importantly, Securities and Exchange Commission
13  rules, that forbid them from investing in debt that has not achieved a certain bond
14  rating.

15     117.   If municipal securities had been properly rated, California
16  municipalities and public entities would not have been forced to pay high
17  insurance premiums and endure higher borrowing costs that are a direct result of
18  their supposed "insurer" losing their triple-A bond rating.

19     118.   In their agreements with Plaintiff Stockton, the insurer Defendants
20  stated that they were "AAA"-rated entities. Indeed, if not for this promise,
21  Stockton's bonds would not have been upgraded to triple-A. Stockton paid the
22  premiums with the expectation that it was buying insurance from a triple-A rated
23  entity. However, the insurer Defendants failed to disclose to Plaintiff Stockton,
24  and other corporate entities, the true extent of their exposure to the subprime CDO
25  market. Even the Defendants' initial acknowledgments of financial problems tried
26  to downplay the problem. Today, the exposure of the Defendants to subprime
27  instruments is large enough to cause serious stress to the ability of the Defendants
28  to support their insurance obligations.

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                    29

119.   In addition, the insurer Defendants also issued financial statements that were misleading.  In those financial statements, the insurer Defendants reiterated the strength of their financial condition and the fact that they were "AAA" rated entities.  However, these statements were false and misleading because the insurer Defendants failed to state that their record profits were being obtained only by insuring hundreds of billions of dollars of high risk subprime instruments.

120.   Barney Frank, the chairman of the House Financial Services Committee has stated that the bond insurers, including the Defendants, erred when they insured speculative structure-finance products after backing safe municipal bond deals.  "They insured a safe product and then took that money and speculated in ways that they endangered the cities and town that they were insuring."  Barney Frank went on to state, "[t]his is the private sector having facilitated harm."

## VIII.

### CREDIT RATING AGENCIES ADMIT THE FLAWED NATURE OF THE DUAL RATING SYSTEM

121.   In a press release, Treasurer Bill Lockyer stated, "Our message to the agencies is simple. ***Treat taxpayers the same as corporations.***  Don't make them pay more to finance schools and roads than corporate entities pay when they bundle bonds into fancy, opaque investment vehicles.  Rate municipal bonds based on the risk of default.  End the double standard and create a unified, global rating approach that treats all issuers equally, and better serves taxpayers and investors."

122.   On March 4, 2008 the California Treasurer and government officials from Oregon, Connecticut and thirteen other states and cities wrote to Fitch, Moody's and S&P to urge them to end the unfair dual standard in rating government bonds.  Due to the pressure from government officials such as the California Treasurer, Moody's and Fitch have finally agreed to take some steps to rationalize their rating systems.  The resulting scandal has led the Credit Rating



LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  Agencies to reevaluate the unfair dual rating system that has long been

2  perpetuated by the Defendants.

3      123. Fitch assigned Group Managing Director Robert Grossman to

4  "harmonize" the ratings for corporate and public finance ratings.

5      124. As a result, Fitch, on March 19, 2008, stated, "As we developed our

6  capital model, it was our belief that other models currently used in the market

7  *overstated the risk of many US municipal exposures* insured by the financial

8  guarantors and understated the risk of many structured finance exposures. We

9  believe this to be evident when reviewing historical default studies that show the

10  default rate on US municipal debt is a fraction of that on corporate debt, whereas

11  the default rate on structured finance debt is equal to, if not moving higher than,

12  that of corporate debt. Thus, a key goal in developing a new model was to address

13  this perceived imbalance found in existing models."

14      125. Moody's first stated in May of 2008 that it would provide global

15  scale ratings, their term for the corporate standard bond rating, to municipal

16  issuers, at the request of issuers. Moody's also stated that it would simplify the

17  conversion table it uses to estimate global ratings for bonds. This should have

18  been done much earlier so that investors could compare municipal bonds and

19  corporate bonds on a true "apple-to-apple" basis.

20      126. On June 12, 2008, Moody's reversed course, proposing to alter the

21  rating system for municipal bonds to be in line with its global rating scale for

22  corporations. Gail Sussman, managing director for public finance at the New

23  York-based company, said the change will eventually lead to upgrades of some of

24  its 78,000 municipal ratings. This proposal is an admission that the original dual

25  rating system was flawed, forcing California municipalities to spend hundreds of

26  millions of dollars unnecessarily on bond insurance. Bloomberg.com, June 2008.

27      127. Recently, S&P has announced that it is appointing an ombudsman to

28  "study" whether there are any "conflicts of interest" in the way it develops ratings.

1  Furthermore, an external firm is being hired to review S&P's ratings to check if

2  the agency has handled conflicts of interest properly and maintained

3  independence.

4      128.  S&P has now upgraded more than 5,000 municipal bonds in order to

5  bring the rating of these municipal bonds more in line with its criteria for rating

6  corporate bonds. This is also an admission that the dual rating system, which

7  Defendants conspired to pressure the Credit Rating Agencies to maintain, was

8  inherently flawed.

9  **IX.**

10  **INDUSTRY ASSOCIATIONS USED FOR CONSPIRACY**

11      129.  Industry associations in the municipal bond industry proved to be one

12  of the mechanisms through which the unlawful and illegal acts occurred. During

13  those meetings, discussions and other communications occurred in which the

14  Defendants discussed how to manipulate the system for their benefit. These

15  conferences served as one of the means in which the wrongdoing against

16  California public entities was perpetuated.

17      130.  There are several trade groups the Defendants belong to at which the

18  Defendants engaged in anti-competitive and unlawful behavior. One of the largest

19  groups is the Securities Industry and Financial Markets Association (SIFMA).

20      131.  SIFMA is an industry trade group representing securities firms,

21  banks, and asset management companies. SIFMA was formed on November 1,

22  2006, from the merger of The Bond Market Association and the Securities

23  Industry Association. SIFMA's mission is to "promote policies and practices that

24  work to expand and perfect markets, foster the development of new products and

25  services, and create efficiencies for member firms, while preserving and enhancing

26  the public's trust and confidence in the markets and the industry."

27      132.  Amongst SIFMA's members are Ambac, MBIA, Fitch, Moody's and

28  Standard & Poor's. All of the Defendants used these opportunities to conspire and

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  perpetuate the scheme that has cost California taxpayers billions of dollars in

2  higher interest rates and borrowing costs and in unnecessary fees and costs.

3      133.   The Information Management Network ("IMN") holds Municipal

4  Finance Conferences in California. At these meetings, municipal bond issuers,

5  municipal bond rating agencies and municipal bond insurance companies meet to

6  discuss and exchange information. The Defendants use these association meetings

7  and conferences as one of many means, including other forms of communication,

8  to conspire to the detriment of California local and municipal entities. The IMN

9  California Municipal Finance Conference has been held at the **Ritz Carlton Hotel**

10 **in San Francisco for the last two years.** Representatives of the Credit Rating

11 Agencies are present at this conference as are senior representatives of the

12 Defendant insurance companies, including Defendant Jason Kissane, the head of

13 MBIA's San Francisco office and MBIA's West Coast operations, Defendant Neil

14 Pack, the current head of CIFG's San Francisco office, as well as Kathleen

15 McDonough, a senior managing director at Defendant Ambac. At this conference,

16 they discussed the municipal bond insurance industry and how to maintain the

17 bond insurance business by perpetuating the dual rating system.

18     134.   The Bond Buyer holds an Annual California Public Finance

19 Conference in which professionals in the municipal bond industry meet to discuss

20 and exchange information in the municipal bond industry. The Bond Buyer is a

21 major publication focusing on public financing, including municipal bonds. The

22 Bond Buyer's Annual California Public Finance Conference is a meeting place for

23 Defendants to exchange information. It also served as a cover for the Defendants

24 to perpetuate their wrongdoing. The 17th Annual California Public Finance

25 Conference was held in Carlsbad, California in 2007. Both Defendants Jason

26 Kissane and Neil Pack were present at the California Public Finance Conference

27 where the issues alleged in this complaint were discussed. Representatives from

28 most of the Defendant insurance companies, as well as representatives from the

1    Credit Rating Agencies were all present at the conference and discussed the

2    allegations made above.

3        135.   The Association of Financial Guaranty Insurers (AFGI), formed in

4    1986, is one of the biggest trade associations for bond insurance companies.  They

5    are the trade association of the insurers and reinsurers of municipal bonds and

6    asset-backed securities.  Amongst their members are the major municipal bond

7    insurance companies, including Ambac and XL Capital.

## X.

### CALIFORNIA PUBLIC ENTITIES SUCH AS STOCKTON SUFFERED

### INJURY THROUGH THE CONDUCT OF THE DEFENDANTS

11       136.   Through their unlawful acts, the Defendants acted to the detriment of

12   Plaintiff Stockton and California local and municipal government entities, leading

13   to the Defendant insurers reaping unlawful profits from California public entities.

14   Stockton alone has paid millions in bond insurance premiums to the Defendant

15   insurers during the past few years for bond insurance that is essentially worthless.

16       137.   The Defendants acted to the detriment of Stockton, as well as other

17   California public entities and California citizens.  The wrongful acts of the

18   Defendants have served to unlawfully increase the costs to municipalities for

19   issuing bonds while filling the bank accounts of the Defendants.

20       138.   In so doing, the Defendants have committed unlawful acts that

21   allowed them to illegally and improperly obtain California public monies,

22   including the public monies of Plaintiff Stockton.

23       139.   The nature of the Defendants' unlawful acts has caused serious harm

24   to the Plaintiff and other California cities and counties.  As a direct result of the

25   conduct of the Defendants, Plaintiff Stockton and other California public entities

26   paid high premiums for worthless bond insurance.  All of this has resulted in

27   serious harm to Plaintiff and other California public entities.

28

# XI.

## GOVERNMENT INVESTIGATIONS INTO THE
## DUAL RATING SYSTEM IN THE BOND MARKET

140.  In October 2007, the Connecticut Attorney General's office issued subpoenas to Fitch, Moody's and S&P as part of an overall investigation into the practices of the municipal bond industry. The "investigation seeks to determine whether credit-rating agencies may be exploiting their dominant positions to unfairly raise prices or exclude competitors.  Assuming debt ratings are honest and untainted is vital to investors, companies and government." *Wall Street Journal*, October 27, 2007.

141.  In a Form 10-Q filed with the SEC Oct. 26, 2007, McGraw-Hill, the parent of S&P, said: "On October 16, 2007, Standard & Poor's received a subpoena from the Connecticut Attorney General's Office requesting information and documents relating to the conduct of Standard & Poor's credit ratings business."  The company said it was responding to the subpoena.

142.  Moody's disclosed in its 10-Q filed with the SEC on November 2, 2007, that it "has received subpoenas and inquiries from states attorneys general and governmental authorities and is cooperating with those inquiries."  No other details were released.

143.  The *Wall Street Journal* article quoted Fitch spokesman Jim Cockle as saying Fitch had been contacted by AG's and other regulators. "A lot of regulatory authorities and interested parties are in the process of investigating the ratings agencies, and we are cooperating with all of them," he said.

144.  The Connecticut Attorney General testified before the House Committee on Financial Services on March 12, 2008, focusing on the rating system for municipal bonds. He said the current dual system of rating bonds issued by public entities "is dangerously misleading and misguided.  It imposes a secret Wall Street tax on states, cities and school district across this nation."  He also

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                35

1  said the investigation he launched in October "is still ongoing and active" and

2  "focuses on how this unfair system was started and perpetuated, who profits from

3  it, and what anticompetitive effects it has on the prices that states and

4  municipalities pay to borrow for essential projects like schools and roads."

5      145.  The Attorney General charged that the "misuse of market power and

6  restraint of competition" by the municipal bond rating agencies "is plainly

7  anticompetitive and anti-taxpayer, causing direct harm to municipal and state

8  customers issuing bonds:"————————

9      146.  On January 23, 2008, Massachusetts securities regulators subpoenaed

10  documents from Defendants **Ambac** and **MBIA** in order to determine if the

11  insurers informed Massachusetts communities that were trying to raise money

12  about the insurers' own exposure to collateralized debt obligations.

13      147.  Massachusetts' Secretary of the Commonwealth questioned whether

14  Massachusetts cities and towns would have relied on Defendants Ambac and

15  MBIA for financial guarantees to ensure bond investors are repaid if the

16  governments had known about the firms' guarantees of CDOs. The failure of

17  MBIA and Ambac to fully disclose their exposure to CDOs was both illegal and

18  improper.

19      148.  In May of 2008, SEC Chairman Christopher Cox announced that the

20  SEC was considering proposing new rules for Nationally Recognized Statistical

21  Rating Organizations ("NRSRO"). The purpose of these new rules are to: enhance

22  investor understanding of the important differences between ratings for municipal,

23  corporate and structured debt instruments; regulate and limit conflicts of interest,

24  reduce regulatory reliance on ratings and disclose the role of third party due

25  diligence in assigning ratings.

26      149.  In June of 2008, all three of the Credit Rating Agencies entered into

27  settlement agreements with the New York Attorney General in which all three

28  have agreed to change their way of doing business. Most importantly, they have

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1   been forced to resolve their involvement in the subprime market meltdown and
2   avoid the conflicts of interest that affected their ratings of securities.

3       150.   Also, in June of 2008, the SEC announced new rules regulating all
4   NRSROs which would also lead to significantly greater transparency on the part of
5   the Credit Rating Agencies regarding their rating methodology, greater clarity on
6   how to interpret and understand their ratings, and also regulating the conflicts of
7   interests that have tainted the ratings given by the Credit Rating Agencies.

## XII.

### FRAUDULENT CONCEALMENT

10      151.   Throughout the relevant period, Defendants affirmatively and
11  fraudulently concealed their unlawful conduct from Plaintiff Stockton.

12      152.   Plaintiff did not discover, and could not discover through the exercise
13  of reasonable diligence, that the Defendants were engaging in the illegal and
14  unlawful conduct as alleged herein until shortly before this litigation was
15  commenced.  Nor could Plaintiff have discovered the violations earlier than that
16  time because Defendants engaged in their wrongdoing in secret, concealing the
17  nature of their unlawful conduct and acts in furtherance thereof, and fraudulently
18  concealed their activities through various other means and methods designed to
19  avoid detection.  The nature of the wrongful act itself was to withhold the
20  disclosure of material financial information about the insurer Defendants from the
21  Plaintiff and other California public entities.

22      153.   Plaintiff could not have discovered the unlawful conduct at an earlier
23  date through the exercise of reasonable diligence because of Defendants' active
24  and purposeful concealment of their unlawful activities.  Indeed, it was not until
25  late 2007 and the beginning of 2008 that the insurer Defendants were downgraded
26  and placed on negative credit watch.

27
28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                          37

154.  As a result of Defendants' fraudulent concealment of their wrongful acts, Plaintiff asserts the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff.

**XIII.**

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**BREACH OF THE COVENANT**

**OF GOOD FAITH AND FAIR DEALING**

**(Against Defendants Ambac, MBIA, FGIC, XL Capital, ACA and CIFG)**

155.  Plaintiff repeats and realleges each of the foregoing paragraphs of this complaint and incorporate them by reference as though set forth in full herein.

156.  The insurer Defendants entered into bond insurance contracts with the Plaintiff and owed it a duty of good faith and fair dealing.  By insuring risky subprime loans and investing heavily in the subprime markets, the insurer Defendants violated that duty of good faith and fair dealing.  By failing to disclose their weak financial condition and exposure to the subprime market, the insurer Defendants also violated that duty of good faith and fair dealing.  The sole asset that the bond insurance companies sold to the Plaintiff was their "AAA" rating which they improperly and unlawfully jeopardized by insuring subprime loans and other subprime market instruments.  The insurer Defendants compounded their wrongdoing by failing to disclose their true risk exposure to Plaintiff Stockton.  If the insurer Defendants had disclosed the nature of their wrongful conduct, Plaintiff Stockton would not have purchased bond insurance from the insurer Defendants.

157.  The illegal and unlawful acts alleged herein have had the following effects on Plaintiff: (1) requiring the expenditure of unnecessary taxpayer dollars for the acquisition of municipal bond insurance; and (2) being forced to pay unreasonably high interest rates on the issuance of municipal bonds.

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as set forth below.

## SECOND CAUSE OF ACTION

## FRAUD AND DECEIT

## (Against Defendants Ambac, MBIA, FIGC, XL Capital, ACA and CIFG)

158. Plaintiff repeats and realleges each of the foregoing paragraphs of this complaint and incorporate them by reference as though set forth in full herein.

159. The insurer Defendants, and each of them, made material representations and omissions to Plaintiff which were false and misleading, including but not limited to those representations and omissions as to the financial condition of the Defendants. These material misrepresentations and omissions are contained in and reflected in public statements, including financial statements, and other disclosures made by the Defendants.

160. The insurer Defendants had an obligation and duty to disclose to the Plaintiff that they had exposed themselves to risky subprime loans and that their triple-A credit rating was not deserved. The Defendants, and each of them, made the representations and failed to disclose and suppressed information they had a duty to disclose, as set forth hereinbefore. The Defendants did so with knowledge of the falsity of their statements and representations and knew that they were failing to disclose material facts which they had a duty to disclose.

161. At the time these misrepresentations were made and the material facts not disclosed, the Plaintiff was ignorant of the true facts. If the Plaintiff had known the true facts, they would not have purchased bond insurance from the Defendants. Plaintiff reasonably relied on these representations in purchasing municipal bond insurance from the Defendants.

162. As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff purchased bond insurance from the Defendants and has

1   since suffered and will continue to suffer economic losses and other general and

2   specific damages, all in an amount to be determined according to proof.

3       WHEREFORE, Plaintiff prays for judgment against Defendants, and each of

4   them, as set forth below.

5                           ### THIRD CAUSE OF ACTION

6                               ### BREACH OF CONTRACT

7   **(Against Defendants Ambac, MBIA, FGIC, XL Capital, ACA and CIFG)**

8       163.   Plaintiff repeats and realleges each of the foregoing paragraphs of this

9   complaint and incorporate them by reference as though set forth in full herein.

10      164.   Plaintiff entered into bond insurance agreements with the Defendant

11  bond insurance companies. As part of those agreements, the Defendants had a

12  duty to act in good faith to maintain their triple-A rating. Indeed, the purpose of

13  the contract was to acquire insurance from a "triple-A" bond insurance company,

14  not a company that had billions of dollars of hidden exposures and liabilities. The

15  size and extent of those liabilities were massive enough to jeopardize the "triple

16  A" rating of the bond insurance companies, the very product the bond insurance

17  companies were selling to Plaintiff Stockton.

18      165.   Stockton has performed each and every act required to be performed

19  by it pursuant to the bond insurance agreements.

20      166.   The insurer Defendants have breached the insurance agreements

21  through their reckless conduct in exposing themselves to the subprime markets for

22  billions of dollars.

23      139.   As a direct and legal result of this breach of contract, Plaintiff

24  Stockton has been damaged in an amount to be ascertained at the time of trial.

25      WHEREFORE, Plaintiff prays for judgment against Defendants, and each of

26  them, as set forth below.

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                    40

# FOURTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

### (Against All Defendants)

167.   Plaintiff repeats and realleges paragraphs ¶¶ 1 - 154 of this complaint and incorporate them by reference as though set forth in full herein.

168.   The insurer Defendants, and each of them, made material representations and omissions to Plaintiff which were false and misleading, including but not limited to those representations and omissions as to the financial condition of the Defendants. These material misrepresentations and omissions are contained in and reflected in public statements, including financial statements, and other disclosures made by the Defendants.

169.   The Defendants had an obligation and duty to disclose to the Plaintiff that they had exposed themselves to risky subprime loans and that their triple-A credit rating was not deserved. In making the representations and omissions, and in doing the above things alleged, Defendants, and each of them, acted without any reasonable grounds for believing their representations were true, and intended by said representations to induce the reliance of the Plaintiff to purchase bond insurance. Plaintiff relied upon these false representations, concealments, and nondisclosures by Defendants, and because of this, purchased bond insurance from the Defendants.

170.   At the time these misrepresentations were made and the material facts not disclosed, the Plaintiff was ignorant of the true facts. If the Plaintiff had known the true facts, they would not have purchased bond insurance from the Defendants.

171.   Plaintiff reasonably relied on these representations in purchasing municipal bond insurance from the Defendants.

172.   As a direct and proximate result of the wrongful conduct of each of the Defendants, Plaintiff purchased bond insurance from the Defendants and has

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

1  since suffered and will continue to suffer economic losses and other general and

2  specific damages, all in an amount to be determined according to proof.

3  ## FIFTH CAUSE OF ACTION

4  ## NEGLIGENCE

5  **(Against Defendants Ambac, MBIA, FIGC, XL Capital, ACA and CIFG)**

6  173.  Plaintiff repeats and realleges paragraphs ¶¶ 1 - 154 of this complaint

7  and incorporate them by reference as though set forth in full herein.

8  174.  Plaintiff is informed and believed, and thereupon allege that the acts

9  of the Defendants in insuring sub-prime mortgage instruments and other financial

10  instruments such as CDO's was done negligent and carelessly.  In addition, due to

11  the flawed methodology of rating such securities employed by the Credit Rating

12  Agencies, it was negligent for the Defendants to insure both these high risk

13  instruments while simultaneously insuring safe municipal bonds that relied on that

14  insurance to maintain high ratings on their own bond issuances.  Defendants owed

15  a duty to Plaintiff Stockton not to act in a reckless and unreasonable manner.  The

16  Defendants breached that duty and, as a result, caused the economic harm, injury

17  and/or damage to Plaintiff that are hereinabove set forth.

18  175.  As a direct and legal cause of the Defendants' wrongful acts and/or

19  omissions, Plaintiff has suffered and will continue to suffer harm from the

20  payment of insurance premiums for bond insurance that possesses no value, for

21  higher interest rates caused by the credit downgrade of the Defendants and for any

22  other refinancing costs endured due to the Defendants' misconduct.

23  WHEREFORE, Plaintiff prays for judgment against Defendants, and each of

24  them, as set forth below.

25  / / /

26  / / /

27  / / /

28  / / /

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                              42

## SIXTH CAUSE OF ACTION

## VIOLATIONS OF CALIFORNIA CARTWRIGHT ACT

### (Against All Defendants)

176.   Plaintiff repeats and realleges paragraphs ¶¶ 1 - 154 of this complaint and incorporate them by reference as though set forth in full herein.

177.   The Defendants violated California Business and Professions Code section 16720, *et seq.* (the "Cartwright Act"), by forming one or more combinations to accomplish purposes prohibited by and contrary to the Cartwright Act. They engaged in an agreement, contract, combination, trust and/or conspiracy to create and maintain artificial conditions for the acquisition of municipal bond insurance.

178.   The Defendants committed acts that constituted prohibited conduct under the Cartwright Act, including but not limited to making illegal agreements among themselves to reduce competition and to raise and establish the price and cost of municipal bond insurance. Defendants' conspired to prop up a system that was unfair and harmful to California public entities by requiring them to spend hundreds of millions of dollars to buy bond insurance. Defendants' conduct has unfairly and unlawfully increased the cost for the acquisition of municipal bond insurance in the State of California.

179.   The California Supreme Court has specifically stated that a cause of action under the California Cartwright Act can be brought against the insurance industry in *Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257.

180.   As a direct result of the unlawful and unfair actions of the Defendants, Plaintiff suffered injury to its business and property. It has had to pay substantially more for the acquisition of municipal bond insurance than they would have absent Defendants' illegal and anti-competitive conspiracy. Moreover, it has had to endure higher interest rates and borrowing costs as a result of the improper conduct, as well as pay unnecessary premiums and costs to the

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT

43

1    Defendants.  These injuries have caused and will continue to cause damages to

2    Plaintiff.

3         181.   As a direct result of the acts of the Defendants, Plaintiff was required

4    to file this action, resulting in ongoing attorneys' fees, costs, and other expenses

5    for which it seeks recovery according to proof.

6         182.   Pursuant to the Cartwright Act, Plaintiff is authorized to recover three

7    times the damages it sustained plus interest and reasonable attorneys' fees, costs

8    and expenses.

9         WHEREFORE, Plaintiff prays for judgment against Defendants, and each of

10   them, as set forth below.

11                      **PRAYER FOR RELIEF**

12        WHEREFORE, Plaintiff prays that:

13        A.    The Court adjudge and decree that the acts of the Defendants are

14   illegal and unlawful and in violation of California state common and statutory law;

15        B.    Judgment be entered against Defendants, jointly and severally, and in

16   favor of Plaintiff for damages as allowed by law as determined to have been

17   sustained by them;

18        C.    Each of the Defendants, successors, assigns, parents, subsidiaries,

19   affiliates and transferees, and their respective officers, directors, agents and

20   employees, and all other persons acting or claiming to act on behalf of Defendants

21   or in concert with them, be permanently enjoined and restrained from, in any

22   manner, directly or indirectly, continuing, maintaining or renewing the

23   combinations, conspiracy, agreement, understanding or concert of action as

24   alleged herein;

25        D.    The Court award Plaintiff's attorneys' fees and costs, and

26   pre-judgment and post-judgment interest as permitted by law; and

27        E.    Because the aforementioned acts of Defendants, and each of them,

28   were done maliciously, oppressively, and with intent to defraud, Plaintiff is

LAW OFFICES
COTCHETT,
PITRE &
McCARTHY

COMPLAINT                                                                44

1   entitled to punitive and exemplary damages in an amount to be shown according

2   to proof at the time of trial.

3          F.      The Court award Plaintiff such other and further relief as may be

4   necessary and appropriate.

5

6   DATED: July 23, 2008            **PARISH & SMALL**

7

8                                   By: _William H. Parish @_

9                                        WILLIAM H. PARISH

10  DATED: July 23, 2008            **COTCHETT, PITRE & McCARTHY**

11

12                                  By: _Joseph W. Cotchett @_

13                                       JOSEPH W. COTCHETT

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
COTCHETT,
PITRE &
MCCARTHY

COMPLAINT                                                                    44

1

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all of the claims asserted in this Complaint so triable.

DATED: July 23, 2008                    **PARISH & SMALL**

By: _William H. Parish_
     WILLIAM H. PARISH

DATED: July 23, 2008                    **COTCHETT, PITRE & McCARTHY**

By: _Joseph W. Cotchett_
     JOSEPH W. COTCHETT

CITY OF STOCKTON v. AMBAC FINANCIAL GROUP INC., et al.

NOTICE OF REMOVAL OF CIVIL ACTION FROM THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA FOR THE COUNTY OF SAN FRANCISCO;
DECLARATION OF SCOTT COOPER IN SUPPORT THEREOF

# EXHIBIT B

1    PROSKAUER ROSE LLP
     SCOTT P. COOPER, SBN 96905
2    KEITH BUTLER, SBN 215670
     2049 Century Park East, 32nd Floor
3    Los Angeles, California 90067-3206
     Telephone:    (310) 557-2900
4    Facsimile:    (310) 557-2193

5    Attorneys for Defendant
     MBIA, INC.
6

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                  FOR THE COUNTY OF SAN FRANCISCO

9
     CITY OF STOCKTON,                    )    Case No. CGC-08-477848
10                                        )
                  Plaintiff,              )    [Assigned to the Hon. Arlene T. Borick
11                                        )    – Dept. 212]
            v.                            )
12                                        )    NOTICE TO STATE COURT OF
     AMBAC FINANCIAL GROUP INC.; MBIA, INC.; )  DEFENDANTS' FILING OF
13   XL CAPITAL ASSURANCE INC.; ACA        )   NOTICE OF REMOVAL TO U.S.
     FINANCIAL GUARANTY CORP; FINANCIAL    )   DISTRICT COURT FOR THE
14   GUARANTY INSURANCE COMPANY; CIFG      )   NORTHERN DISTRICT OF
     ASSURANCE NORTH AMERICA, INC.; JASON  )   CALIFORNIA
15   KISSANE; NEIL PACK; and Does 1 – 50,  )
                                          )
16                Defendants.             )    Action Filed: July 23, 2008
                                          )
17                                        )
                                          )
18   ───────────────────────────────     )

19

20

21

22

23

24

25

26

27

28

1    TO THE HONORABLE ARLENE T. BORICK, JUDGE OF THE SUPERIOR COURT OF THE

2    STATE OF CALIFORNIA, FOR THE COUNTY OF SAN FRANCISCO:

3            PLEASE TAKE NOTICE that on August 22, 2008, a Notice of Removal of the above-

4    entitled action pursuant to 28 U.S.C. § 1441(b) was filed in the United States District Court for the

5    Northern District of California, bearing Case No. _____. A true and correct copy

6    of the Notice of Removal filed with the United States District Court for the Northern District of

7    California is attached hereto as Exhibit A. Pursuant to 28 U.S.C. ¶ 1446(d), this Court "shall

8    proceed no further unless and until the case is remanded."

9

10

11  DATED: August 22, 2008          PROSKAUER ROSE LLP
                                 SCOTT P. COOPER
12                              KEITH BUTLER

13

14                          By: _____
                                 Scott P. Cooper
15                          Attorneys for Defendants
                        MBIA, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

7583/53559-017
Current/11891203v

CITY OF STOCKTON v. AMBAC FINANCIAL GROUP INC., et al.

NOTICE OF REMOVAL OF CIVIL ACTION FROM THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA FOR THE COUNTY OF SAN FRANCISCO;
DECLARATION OF SCOTT COOPER IN SUPPORT THEREOF

# EXHIBIT C

1  PROSKAUER ROSE LLP
   SCOTT P. COOPER, SBN 96905
2  KEITH BUTLER, SBN 215670
   2049 Century Park East, 32nd Floor
3  Los Angeles, California 90067-3206
   Telephone:    (310) 557-2900
4  Facsimile:    (310) 557-2193

5  Attorneys for Defendant
   MBIA, INC.

6

7              SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                  FOR THE COUNTY OF SAN FRANCISCO

9

10 CITY OF STOCKTON,                          ) Case No. CGC-08-477848
                                              )
                 Plaintiff,                   ) [Assigned to the Hon. Arlene T. Borick
11                                            ) – Dept. 212]
12         v.                                 )
                                              ) **NOTICE TO ADVERSE PARTY OF**
13 AMBAC FINANCIAL GROUP INC.; MBIA, INC.; )  **DEFENDANTS' FILING OF**
   XL CAPITAL ASSURANCE INC.; ACA             ) **NOTICE OF REMOVAL TO U.S.**
14 FINANCIAL GUARANTY CORP; FINANCIAL         ) **DISTRICT COURT FOR THE**
   GUARANTY INSURANCE COMPANY; CIFG           ) **NORTHERN DISTRICT OF**
15 ASSURANCE NORTH AMERICA, INC.; JASON       ) **CALIFORNIA**
   KISSANE; NEIL PACK; and Does 1 – 50,       )
16                                            ) Action Filed: July 23, 2008
                 Defendants.                  )
17                                            )
                                              )
18                                            )

19

20

21

22

23

24

25

26

27

28

1    TO PLAINTIFF CITY OF STOCKTON AND ITS ATTORNEYS OF RECORD:

2            PLEASE TAKE NOTICE that on August 22, 2008, a Notice of Removal of the above-

3    entitled action pursuant to 28 U.S.C. § § 1441(b) was filed in the United States District Court for

4    the Northern District of California, bearing Case No. _____. A true and

5    correct copy of the Notice of Removal filed with the United States District Court for the Northern

6    District of California is attached hereto as Exhibit A.

7

8

9    DATED:  August 22, 2008              PROSKAUER ROSE LLP
                                          SCOTT P. COOPER
10                                        KEITH BUTLER

11

12                                        By: _____
                                               Scott P. Cooper
13                                        Attorneys for Defendants
                                          MBIA, INC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE TO ADVERSE PARTY OF DEFENDANTS' FILING OF NOTICE OF REMOVAL
TO U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

7583/53559-017
Current/11891158v

CITY OF STOCKTON v. AMBAC FINANCIAL GROUP INC., et al.

NOTICE OF REMOVAL OF CIVIL ACTION FROM THE SUPERIOR COURT OF THE
STATE OF CALIFORNIA FOR THE COUNTY OF SAN FRANCISCO;
DECLARATION OF SCOTT COOPER IN SUPPORT THEREOF

# EXHIBIT D

## CONSENT TO REMOVAL

Defendant CIFG Assurance North America, Inc. ("CIFG") hereby consents to removal of this action, *City of Stockton v. Ambac Financial Group Inc. et al.*, Docket No. CGC-08-477848, to federal court. This consent is given without waiving, and with a full reservation of, any and all rights, claims, and defenses of any nature whatsoever that CIFG may have, including but not limited to defenses related to service of process, jurisdiction, and venue.

Dated:  New York, New York
         August 22, 2008

Respectfully submitted,
CADWALADER, WICKERSHAM &
TAFT LLP

Jonathan M. Hoff
*jonathan.hoff@cwt.com*
One World Financial Center
New York, New York 10281
(212) 504-6474
Fax: (212) 504-6666

Attorneys for Defendant CIFG Assurance
North America, Inc.

## CONSENT TO REMOVAL

Defendant ACA Financial Guaranty Corp. ("ACA") hereby consents to removal of this action, *City of Stockton v. Ambac Financial Group Inc. et al.*, Docket No. CGC-08-477848, to federal court. This consent is given without waiving, and with a full reservation of, any and all rights, claims, and defenses of any nature whatsoever that ACA may have, including but not limited to defenses related to service of process, jurisdiction, and venue.

Dated:  August 22, 2008

Respectfully submitted,
HIRSCHMANN LAW GROUP

Ralph F. Hirschmann
*rfh@hirschmannlaw.com*
Shane W. Tseng
*swt@hirschmannlaw.com*
707 Wilshire Boulevard, Suite 3260
Los Angeles, California 90017
Telephone:    (213) 891-1700
Facsimile:    (213) 891-1556

FRIED, FRANK, HARRIS, SHRIVER
   & JACOBSON LLP
Douglas Flaum
*douglas.flaum@friedfrank.com*
Shahzeb Lari
*shahzeb.lari@friedfrank.com*
One New York Plaza
New York, New York 10004-1980
Telephone:    (212) 859-8000
Facsimile:    (212) 859-4000

*Attorneys for Defendant*
*ACA Financial Guaranty Corp.*

7095086.1

## CONSENT TO REMOVAL

Defendant Ambac Financial Group, Inc. ("Ambac") hereby consents to removal of this action, *City of Stockton v. Ambac Financial Group Inc. et al.*, Docket No. CGC-08-477848, to federal court. This consent is given without waiving, and with a full reservation of, any and all rights, claims, and defenses of any nature whatsoever that Ambac may have, including but not limited to defenses related to service of process, jurisdiction, and venue.

Dated:  New York, New York
        August 22, 2008

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP
Robert P. LoBue
*rplobue@pbwt.com*
1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2596
Fax:  (212) 336-2395

-and-

MURPHY, PEARSON, BRADLEY & FEENEY

James A. Murphy
*jmurphy@mpbf.com*
88 Kearny Street, 10th Floor
San Francisco, Ca  94108
(415) 788-1900
Fax: (415) 393-8087

*Attorneys for Defendant Ambac Financial Group, Inc.*

1974307v.1

## CONSENT TO REMOVAL

Defendant Financial Guaranty Insurance Company ("FGIC") hereby consents to removal of this action, *City of Stockton v. Ambac Financial Group Inc. et al.*, Docket No. CGC-08-477848, to federal court. This consent is given without waiving, and with a full reservation of, any and all rights, claims, and defenses of any nature whatsoever that FGIC may have, including but not limited to defenses related to service of process, jurisdiction, and venue.

Dated:  August 22, 2008

Respectfully submitted,
RICHARDS KIBBE & ORBE LLP

David W.T. Daniels
*ddaniels@rkollp.com*
Portrait Building
701 8th Street, N.W.
Washington, DC 20001-3727
(202) 261-2960
Fax: (202) 261-2999

Brian S. Fraser
*bfraser@rkollp.com*
One World Financial Center
New York, New York 10281-1003
(212) 530-1800
Fax: (212) 530-1801

Attorneys for Defendant Financial Guaranty
Insurance Company

## CONSENT TO REMOVAL

Defendant XL Capital Assurance Inc. ("XLCA") hereby consents to removal of this action, *City of Stockton v. Ambac Financial Group Inc. et al.*, Docket No. CGC-08-477848, to federal court. This consent is given without waiving, and with a full reservation of, any and all rights, claims, and defenses of any nature whatsoever that XLCA may have, including but not limited to defenses related to service of process, jurisdiction, and venue.

Dated:  Los Angeles, California
        August 22, 2008

Respectfully submitted,

LOEB & LOEB LLP

Daniel G. Murphy (Bar No. 141006)
*dmurphy@loeb.com*
10100 Santa Monica Boulevard
Suite 2200
Los Angeles, California 90067
(310) 282-2000
Fax: (310) 282-2200

DEBEVOISE & PLIMPTON LLP

Mark P. Goodman
*mpgoodman@debevoise.com*
Elliot Greenfield
*egreenfield@debevoise.com*
919 Third Avenue
New York, New York 10022
(212) 909-6000
Fax: (212) 909-6836

Attorneys for Defendant XL Capital
Assurance Inc.

22802676v1